UNITED STATES of America,
Plaintiff-Appellee,

v.

Antonio DOMINGUEZ,
Defendant-Appellant.

No. 86–2707.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1987.

Decided Dec. 8, 1987.

Allan A. Ackerman, P.C., Chicago, Ill., for defendant-appellant.

Kevin E. Milner, Asst. U.S. Atty., James G. Richmond, U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUMMINGS and POSNER, Circuit Judges.

BAUER, Chief Judge.

Antonio Dominguez appeals from his conviction on twenty drug-related counts. He contends that the trial court improperly admitted into evidence a post-arrest oral statement and an immigration application, that if either of these arguments is successful, the evidence was insufficient to convict him, and that the government's rebuttal summation was improper. We reject Dominguez's arguments and affirm his conviction.

I.

A.

In March, 1985, federal agents of the Drug Enforcement Administration (DEA) obtained a court-authorized wiretap for the telephone of Jesus Zambrana of Gary, Indiana. DEA agents monitored conversations between members of the Zambrana family and a "Felipe" in Miami, Florida and

learned that on or about April 25, 1985, a cocaine shipment bound for the Zambranas in Gary would arrive by car from Miami. DEA agents prepared a list of vehicles and drivers that might be involved in the shipment.

On April 25, 1985, DEA agents and officers from the Lake County, Indiana Sheriff's Office staked out highway I-65 in the Crown Point, Indiana area. That night, DEA agent Ehrsam and Sheriff's Deputy Downs saw two persons driving north on I-65 in a 1985 Oldsmobile. The two officers followed the Oldsmobile about five miles before stopping it for traffic violations. When the driver identified himself as Ernest Lonzo, Downs immediately recognized the name as one on the DEA list. Downs ran a check on Lonzo's license, learned that it was suspended, and placed Lonzo under arrest. Other officers helped remove the Oldsmobile to the Lake County Sheriff's impound garage.

DEA agents the next day obtained a warrant to search the Oldsmobile, grounding their affidavit on the taped conversations between the Zambranas and "Felipe" in Miami. When the agents executed the warrant, they found six kilos of cocaine and some cash in a makeshift compartment in the right rear wheel well. An FBI agent testified at trial that one of Dominguez's fingerprints was on the duct tape that sealed the cocaine package.

DEA agents later conducted two similar stakeouts, both based on information gained from the Zambrana wiretap. In May, 1985, DEA agents followed Jay Zambrana and another male passenger in Zambrana's white Monte Carlo to the home of Andres Sanchez in Gary. After a few minutes at Sanchez's home, Zambrana drove off in his white Monte Carlo and his passenger left in a green Monte Carlo. Sanchez later testified that the day before, Zambrana and his passenger had driven to Sanchez's home in the white and green Monte Carlos, dropped off three kilos of cocaine, and left the green Monte Carlo overnight. The green Monte Carlo had Florida license plates numbered "QEB 871."

In June, 1985, DEA agents staked out a Denny's restaurant in Hammond, Indiana. The agents had information that another cocaine shipment was on its way from Miami to the Zambranas, that either Roberto Rodriguez or Dominguez would transport the shipment, and that the meeting might occur at Denny's. By this time, DEA agents had determined that Dominguez was "Felipe," the Miami party in the telephone conversations with the Zambranas. That night, Rodriguez and another male passenger showed up in the green Monte Carlo with the Florida license plates. Dominguez was not in the car.

On July 23, 1985, DEA agents, pursuant to warrants, arrested Rodriguez and Dominguez at Rodriguez's apartment in Miami. The agents read Dominguez and Rodriguez their *Miranda* rights in both English and Spanish. Both Dominguez and Rodriguez indicated that they understood their rights and were willing to answer questions. DEA agents then drove Dominguez first to his business in Miami, "Felipe Iron Works," and next to his home, also in Miami. During the trip from Rodriguez's home to Dominguez's residence, Dominguez, in response to agents' questions, admitted that he also went by the name Felipe. When the DEA agents and Dominguez arrived at his home, Dominguez's wife, Juana, pulled up in the same green Monte Carlo observed during the Indiana stakeouts. DEA agents then searched Dominguez's home with his ostensible consent.

DEA agents also searched the Zambrana home in Gary on July 23, 1985. Agents there found a cut-up Florida license plate in the trunk of a black 1984 Monte Carlo parked in front of the house. That plate was registered to Juana Dominguez at Dominguez's home in Miami. The agents also discovered that the black Monte Carlo had a compartment cut into the right rear wheel well almost identical to the compartment of the Oldsmobile seized earlier in Indiana.

## B.

Dominguez was charged with and convicted of numerous drug-related offenses.

His primary defense during the five-day trial was mistaken identity—that he was not the "Felipe" the government was after. Although the trial court granted Dominguez's motion to suppress evidence found during the search of his home on the ground that his consent was coerced, the court admitted into evidence Dominguez's post-arrest "Felipe" admission and conditionally admitted an Immigration and Naturalization Service (INS) application that tied together the names Felipe and Antonio Dominguez, both over Dominguez's objection.

Dominguez contends on appeal that the trial court improperly admitted into evidence both his admission and the INS application, that if either of these arguments is successful, the evidence was insufficient to convict him, and that the prosecutor's rebuttal summation was improper.

## II.

### A. The "Felipe" Admission

■ Dominguez argues that because it is unclear from the record when the first "Felipe" admission occurred, and because Dominguez apparently admitted he went by the name "Felipe" at least once after DEA agents began their improper search of his home, the trial court should have suppressed his admission as "fruit of the poisonous tree." We reject this claim. The trial court found, after hearing testimony at the suppression hearing, that at least one "Felipe" admission occurred before DEA agents began their improper search of Dominguez's home. Dominguez concedes that this finding was not clearly erroneous. Dominguez, therefore, has no derivative suppression argument.

■ Dominguez also argues that because the DEA agents' elicitation of the "Felipe" admission amounted to interrogation for information important to the government's case, the admission should have been excluded. This unusual argument asks us to stretch the Ninth Circuit's holding in *United States v. Disla,* 805 F.2d 1340 (9th Cir.1986), to effectively overrule the Supreme Court's landmark decision in

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Disla,* government agents, pursuant to a search warrant, searched Disla's apartment while he was absent and found cocaine. When the agents later arrested Disla, the arresting officer asked him, before issuing *Miranda* warnings, to complete a form that contained questions regarding name, age, address, and employment status. When Disla filled in the address of his searched apartment, he incriminated himself. The Ninth Circuit reversed Disla's conviction, reasoning that he did not receive *Miranda* warnings before facing interrogation. *Disla,* 805 F.2d at 1347. The court held that although routine gathering of booking information ordinarily does amount to interrogation, "the ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response." *Id.* The Ninth Circuit thus found that Disla's arresting officer should have known that the question on the form regarding residence was reasonably likely to incriminate Disla. *Id.*

DEA agents, of course, gave Dominguez his *Miranda* warnings before questioning him regarding the name "Felipe" and Dominguez voluntarily answered the agents' questions after receiving the warnings. *Disla* therefore, seems inapposite. Dominguez, however, cultivates much more from *Disla* than meets the eye. He argues that *Disla* condemns the elicitation by government officials of important incriminating information from unwitting defendants, regardless of whether those officials have given *Miranda* warnings. Such reasoning renders all confessions illegal because of their importance to the prosecution's case. This is nonsense. As the Supreme Court stated in *Miranda,* "[c]onfessions remain a proper element in law enforcement." *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630.

### B. The INS Application

At trial, the government sought to introduce into evidence an INS immigration application of Felipe Antonio Dominguez Gonzalez. The government called as a witness

José Lobato, a supervisor of immigration inspectors, to lay the foundation for the application. Lobato testified that from November, 1979 to January, 1980, he worked in Havana, Cuba processing applications of Cubans seeking entry into the United States. Lobato identified the INS application as one that he had processed. He also identified his signature on the last page of the application, which Lobato said indicated that he was the interviewer of this particular applicant. Lobato testified that the application was a true and correct copy of a document that had been kept in the ordinary course of INS business, but that he could not remember this particular application out of the hundreds he processed in his eleven years as an immigration inspector.

Page three of the INS application was a Swedish embassy form that contained a copy of a picture of the applicant. Lobato testified that a completed INS application normally contained such a picture. He also stated that because the United States had no diplomatic ties to Cuba during his stint in Havana, the INS worked out of the Swedish embassy, and thus the Swedish form. Lobato testified that although page three of the application was a Swedish form, it was filled out by INS officials. Lobato also testified that he did not fill out some parts of the application, including some unexplained notations in Spanish. The application also mentioned that the applicant spent time in prison.

Dominguez objected to the admission of the document, arguing that the government had not established sufficiently that the defendant was the applicant. The court, however, conditionally admitted the application into evidence, although it never sent the application to the jury. Lobato identified the applicant in court as Dominguez, and both parties referred to the application in their summations. Dominguez contends that the trial court erred in admitting conditionally the application into evidence. He argues that the application lacked the trustworthiness required for admission as a business record. He also argues, inconsistently, that the document should have gone to the jury.

■ To disturb the trial court's ruling, we must find an abuse of discretion. *United States v. Peters*, 791 F.2d 1270, 1292 (7th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986). The business records exception to the hearsay rule renders admissible

[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by ... a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed.R.Evid. 803(6). The exception is designed to "avoid the burdensome process of 'producing, as witnesses, or accounting for the nonproduction of, all participants in the gathering and transmitting, and recording information.'" *United States v. Keplinger*, 776 F.2d 678, 693 (7th Cir.1985) (quoting Notes of Advisory Committee on Proposed Rule 803), *cert. denied*, — U.S. —, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). Consistent with this purpose, the "qualified witness" need not have personally participated in the creation of the document, nor know who actually recorded the information. *Id.* The witness "need only be someone with knowledge of the procedure governing the creation and maintenance of the type of records sought to be admitted." *Id.*

■ We are satisfied that the trial court did not abuse its discretion in admitting conditionally the INS document. First, we are not persuaded by Dominguez's attacks on Lobato's qualifications. Lobato had knowledge of INS procedures governing the creation and maintenance of INS immigration applications. Lobato stated that he had processed hundreds of similar applications as an INS employee, and that this application was a true and correct copy of official applications kept in the ordinary course of INS business. Lobato also testi-

fied that he was in Havana processing applications when this particular application was processed, and that his signature was on this particular application.

Nor are we persuaded by Dominguez's attacks on the trustworthiness of the document. Lobato explained adequately the Swedish embassy form within the exhibit. In addition, the name on the application was Felipe Antonio Dominguez Gonzalez, and Lobato identified the man in the photograph within the exhibit as Dominguez. Moreover, the birthdate and place of birth on the INS application matched the information taken from Dominguez and printed on his fingerprint card after he was arrested in Miami. All this, coupled with Dominguez's admission that he went by the name "Felipe", convinces us that the district court could find that the government established sufficiently that Dominguez was the applicant and that the court did not abuse its discretion by admitting conditionally the application as a business record. In short, Lobato was qualified and the application was not lacking in trustworthiness.

█ In this case, as we have mentioned, the INS application never went to the jury, and Dominguez now argues that it should have. Dominguez at trial, however, argued vehemently against sending the application to the jury, and we are not persuaded that the trial court abused its discretion in granting Dominguez's wish.

### C. *Sufficiency of the Evidence*

Dominguez next contends that if we decide either of the above two evidentiary matters in his favor, the evidence was insufficient to sustain his conviction. We did not rule in his favor, so we need not consider the sufficiency of the evidence.

### D. *The Prosecutor's Rebuttal Summation*

Both trial counsels zealously advocated their theories of this case during closing arguments. Dominguez argues, however, that the prosecutor crossed the line between fairness and prejudice. He claims that several of the prosecutor's statements warrant reversal of his conviction.

█ In evaluating claims of prosecutorial misconduct, we consider the prosecutor's conduct in the context of the whole trial. *United States v. Holt*, 817 F.2d 1264, 1275 (7th Cir.1987) (citing *United States v. Buchbinder*, 796 F.2d 910, 919 (7th Cir. 1986)). The question is whether the prosecutor's statements "were so inflammatory and prejudicial to defendant petitioner as to deprive him of a fair trial and thus deprive him of his liberty without due process of law as proscribed by the Fourteenth Amendment." *United States v. Zanin*, 831 F.2d 740, 742 (7th Cir.1987). We focus on the probable effect the prosecutor's statements would have on the jury's ability to judge the evidence fairly. *Id.*, at 742 (citing *United States v. Young*, 470 U.S. 1, 12, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985)).

█ Dominguez's first claim is that, during rebuttal summation, the prosecutor impermissibly commented on his right to remain silent with this statement:

> And you know why they're liars? Because they work for the government and [they're] the United States Government, the lawyers, the judges, the police officers, the federal officers are all liars. Do you know who's truthful? Do you know who tells the truth? Him and him. They are the ones who tell the truth.

The prosecutor, Dominguez tell us, pointed at Dominguez and his counsel during the last two sentences. The government argues that the statement does not comment on Dominguez's failure to testify. We agree.

█ It is well established that the fifth amendment and 18 U.S.C. § 3481 prohibit a prosecutor from making an adverse comment before the jury on a defendant's failure to testify. *See Griffin v. California*, 380 U.S. 609, 612–13, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965). To constitute a comment on the defendant's failure to testify, "it must appear that the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." (*United*

States v. Lyon, 397 F.2d 505, 509 (7th Cir.), cert. denied, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968); United States v. Wright, 309 F.2d 735, 738 (7th Cir.1962), cert. denied, 372 U.S. 929, 83 S.Ct. 873, 9 L.Ed.2d 733 (1963)). The prosecutor's statement here falls short of this standard. It did not refer specifically to Dominguez's failure to testify, see United States v. Cox. 428 F.2d 683, 688 (7th Cir.) (prosecutor's comments found permissible because they "made no direct reference to the silence of the accused"), cert. denied, 400 U.S. 881, 91 S.Ct. 127, 27 L.Ed.2d 120 (1970), nor did it invite the jury to consider Dominguez's failure to testify in weighing the evidence, see United States v. Williams, 521 F.2d 950, 953 (D.C.Cir.1975). Thus, we find that the jury would not naturally and necessarily construe the prosecutor's statement as a comment on Dominguez's failure to testify.

▮▮▮ Dominguez next argues that the prosecutor intentionally misstated the evidence when, during rebuttal summation, he stated that Dominguez,

> [s]even years ago before [Dominguez] knew that there was going to be a case involving him smuggling drugs, he told Jose Lobato my name is, I go by the name Felipe.

Although the government concedes that this statement was incorrect insofar as it did not refer specifically to the INS application, we do not believe the statement prejudiced the jury's ability to weigh the evidence fairly. Immediately after the statement, the court told the jury members that it was their province to recall what the evidence reflected. In addition, the prosecutor later corrected himself by stating that it was the application processed by Lobato that indicated that "Felipe" was Dominguez's alias, not Lobato's memory. Finally, the trial court, during its instructions to the jury, stated:

> I instruct you that while it is the right and duty of counsel to address you and to explain the testimony to enable you to

better understand the questions which you are to decide, yet if counsel inadvertently mistake the law or misstate the evidence, you will follow the law as given to you by the court in these instructions and not as stated by counsel. You will take the evidence detailed by the witnesses as shown by the document introduced instead of the statements of counsel.

For these reasons, we find that reversal is not warranted.

▮▮▮ Dominguez also complains of this statement by the prosecutor:

> Thank you, Mr. Dominguez, for coming to our country. Thank you for coming to Miami to push drugs to come up to Northwest Indiana so that my sister can use the drugs.

The government argues that this statement could not have been prejudicial because "the dangers of cocaine are certainly common knowledge." A prosecutor may stress to the jury the seriousness of drug charges and comment on the gravity of this country's drug problem. United States v. Zanin, 831 F.2d 740, 743 (7th Cir.1987). Indeed, we have found appropriate statements referring to the threat of drugs to "the children of the families" to whom the defendants were selling drugs, Zanin, at 743, " 'to our children and friends,' " United States v. Zylstra, 713 F.2d 1332, 1340 (7th Cir.), cert. denied, 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983), and "to the lives and well-being of our children," United States v. Peco, 784 F.2d 798, 810 (7th Cir.), cert. denied, 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986). In each of these cases, however, the prosecutor was referring to the threat of drugs to our society as a whole. See Zanin, at 743 (quoting Zylstra, 713 F.2d at 1340). As we stated in Zanin, the implicit holding of these cases is that "references to individuals' particular family and friends" are inappropriate. Zanin, at 743. The prosecutor's "my sister" reference did just that.[1] We do not, however, believe that the statement warrants reversal. We are confident

---

1. We were fortunate to have the same Assistant United States Attorney who tried this case arguing before us on appeal. During oral argument, counsel stated that he did, in fact, have two

sisters. He admitted, however, that both were in their thirties, were "definitely not little girls," and that the chances of the defendant selling drugs to them were very slim.

that in the context of the entire trial, in which both sides zealously advocated their theories of the case during summations, the jury could weigh the evidence fairly. Nevertheless, the prosecutor has been admonished not to resort to such hyperbole in the future.

 Finally, Dominguez objects to this attempt by the prosecutor to define reasonable doubt:

> Reasonable doubt means that you can't find any reasonable alternatives for the evidence, and there is no reasonable alternative.[2]

In this circuit, instructions by counsel on the meaning of reasonable doubt are improper; indeed, we have cautioned judges not to give such an instruction, *see United States v. Kramer*, 711 F.2d 789, 795 (7th Cir.), *cert. denied*, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983), and the criminal instructions adopted by this circuit forbid it. *See* Federal Criminal Instructions of the Seventh Circuit 2.07 (1980). The government argues that this statement was a proper response to statements by defense counsel under the invited reply rule. The government points to two attempts by defense counsel to define reasonable doubt:

> I mean, if you don't know anything about boats, and the captain says, it's a safe boat; you can bring your family on it, it won't sink. Now, how sure do you want the captain to be? That's proof beyond a reasonable doubt, he's that sure.
>
> . . . .
>
> You get in a car accident and you get to the hospital and the doctor says, well, you know, we got to amputate your legs or you'll die. And you say to the doctor, well, are you sure? Isn't there some way you can save me? The doctor says, no, I'm sure. That's how sure you have to be, because what you're doing to him by convicting him is just as serious to him as amputating his legs or having him drown at sea. I mean, you got to be real sure.

Although the invited response doctrine does not make improper statements proper, it puts arguments in context and assists courts in determining whether a statement unfairly prejudices a defendant. *Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986); *United States v. Reynolds*, 801 F.2d 952, 956 (7th Cir.1986). It is clear to us that both sides in this case got their best shots in on reasonable doubt and that reversal is not warranted. We warn prosecutors and defense attorneys, however, not to engage in arguments about the definition of reasonable doubt. What is inappropriate for the judges in this circuit is equally inappropriate for trial attorneys.

Appellant's conviction is

AFFIRMED.

---

**2.** At oral argument, the Government's counsel, who, as we noted before, tried the case below, identified the source of this definition as "the top of his head."