**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Paul S. FERGUSON,
Defendant–Appellant.**

**No. 89–3603.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1990.
Decided July 8, 1991.

Barry R. Elden, George Jackson, III, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

John D. Robertson, Robertson & Sherrow, Los Angeles, Cal., for defendant-appellant.

Before BAUER, Chief Judge, CUDAHY, and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Paul Samuel Ferguson appeals from his conviction for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). We affirm.

## I. FACTS

This case arises out of an encounter between the defendant, Paul Samuel Ferguson, Chicago Police Detectives Richard Boyle and Andrew Abbott, and Amtrak Police Officer Michael Kosik at Union Station in Chicago, Illinois on March 14, 1989. Boyle, a twenty-four year veteran of the Chicago Police Department, involved in narcotics investigations since 1976, was assigned to the Drug Enforcement Administration/Chicago Police Department Task Force's Airport Interdiction Program monitoring arriving flights and trains for drug couriers.[1]

On March 14, 1989, Ferguson disembarked in Chicago, Illinois from a train originating in Los Angeles, California, carrying two bags, one unlocked bag and one padlocked bag. Ferguson was wearing a blue jean jacket and blue jeans. Detective Boyle described Los Angeles as one of the municipalities the DEA believes to be a source city for narcotics. Boyle, Abbott and Kosik observed Ferguson walk from the train to television monitors reflecting the arrival and departure times of Amtrak trains. During this walk, Ferguson switched the bags from one hand to another. On both occasions that Ferguson switched the bags he looked around the station, and on the second time he looked behind, directly at Boyle, made eye contact with him, and quickly looked away. Boyle, Abbott and Kosik began following Ferguson and Boyle signalled to Abbott that he was continuing to follow Ferguson.

After Ferguson arrived at the monitors, Boyle and Kosik approached him. Boyle showed Ferguson his badge, stated that he was a police officer and that he would like to ask Ferguson a few questions. Ferguson agreed but after a time asked why he was being questioned. At no time did he object or refuse to answer questions. Detective Boyle replied that he was conducting a narcotics investigation, and thereafter Ferguson continued to answer questions. Boyle asked Ferguson for identification and Ferguson gave his California drivers license and his California state identification card listed under the name of Paul Samuel Ferguson. When Boyle asked Ferguson where he was going, Ferguson told him that he was "coming into Chicago." Boyle subsequently asked to see Ferguson's train ticket and observed that the ticket was issued in the name of Michael Davis and listed Detroit as the destination city. When Boyle asked Ferguson why he was traveling under an assumed name, Ferguson hesitated, looked at the floor for a few seconds and said that his brother bought the ticket for him. Boyle observed that Ferguson was breathing heavily, his chest was heaving, his shirt was moving and he was avoiding eye contact with him. Abbott also observed that Ferguson appeared very nervous and continued to avoid eye contact with Boyle. Boyle went on to ask Ferguson if anyone in California had given Ferguson packages or gifts to carry and Ferguson initially stated "yes," and immediately changed his answer, replying that either no one or nobody "gave him anything." In response to further inquiry,

---

1. Another Chicago Police Detective, Andrew Abbott, a 19-year member of the police force, who had been involved in drug investigations for fifteen years, and was also assigned to the Task Force. Abbott was involved in the surveillance of Ferguson, witnessed the contact between Boyle, Kosik, and Ferguson, observed the detention of Ferguson's bags and testified at both the trial and suppression hearing.

Ferguson told Boyle that the bags he was carrying contained his belongings.

At this point Boyle asked for Ferguson's consent to search his luggage and at the same time informed Ferguson that he (Boyle) needed either a search warrant or his (Ferguson's) consent to search his luggage and further advised him (Ferguson) that he was not under arrest. Ferguson refused to give his consent for the search of his luggage. At this point Boyle advised him that he would then detain Ferguson's bags because he believed they contained narcotics. He further informed Ferguson that his bags would be subjected to a sniff by trained dogs for the presence of narcotics which Ferguson could witness if he wished. Boyle stated that if the search proved negative the luggage would be returned, at this time Ferguson was given a receipt for his luggage. Boyle also told Ferguson that he was free to leave if he chose. Ferguson decided to leave and exited the train station. There was neither an arrest nor seizure of Ferguson's person. All of the contacts between Ferguson and the other officers took place in the open, public and well-traveled areas of Union Station, rather than in a private room apart from the public areas.

Ferguson's two bags were taken to the Drug Enforcement Administration office located in Union Station and were placed in a line with three non-suspect bags. Two separate sniffs, each by different dogs trained in narcotics detection, resulted in reactions indicating the presence of narcotics in Ferguson's locked bag.[2]

Within twenty-four hours of the two canine sniffs, a search warrant for a search of the locked bag was obtained. Found inside the bag were 19.2 pounds (9 kilograms) of cocaine with an estimated street value in excess of $1,800,000. Also found in the locked bag were moth balls, clothing, developed photographs, photographic negatives and undeveloped film. On one of the developed photographs was a latent fingerprint of Ferguson. Ferguson's locked bags also contained a business card with a pager

number inscribed thereon that was crossed out and replaced with a different number as well as a scrap of paper with the word "beep," a telephone number, and the name "Portia" inscribed thereon.

An indictment was issued charging Ferguson with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Thereafter, a warrant was issued for Ferguson's arrest, he was apprehended in California and returned to Chicago, Illinois for trial. Prior to trial Ferguson filed a motion to suppress the seizure of the cocaine which was denied after a hearing. Ferguson was tried by a jury, found guilty of violating 21 U.S.C. § 841(a)(1) and sentenced to 121 months in prison to be followed by 5 years of supervised release. Ferguson appeals.

## II. ISSUES PRESENTED

(1) Did the trial court err in denying Ferguson's pretrial motion to suppress the cocaine found in his luggage; (2) Was the evidence sufficient to convict Ferguson of possession of cocaine with intent to distribute; (3) Should the trial court have declared a mistrial when Detective Boyle stated that he requested Ferguson's consent to search his bags; (4) Did the district court commit an abuse of discretion in allowing the jury to view photographs of Ferguson with luxury automobiles, as well as a business card and a scrap of paper with beeper numbers inscribed thereon, all of which were found in the locked bag containing the cocaine; (5) Did the government's references to our society's drug problem in closing argument deprive Ferguson of a fair trial?

## III. SUPPRESSION OF THE COCAINE

Ferguson moved to suppress the cocaine found in his locked bag. In arguing for suppression, the government and Ferguson dispute whether the pre-sniff meeting and discussion between Ferguson and law enforcement officers at the Chicago Union Station was consensual and whether there

---

**2.** The first sniff occurred within thirty minutes of the beginning of the officers' interview of Ferguson and the second sniff occurred approximately forty minutes after the first sniff.

was reasonable suspicion to detain Ferguson's luggage. While the trial court did not explicitly make a determination of whether the encounter between Ferguson and the officers was consensual,[3] the court did hold that there was reasonable suspicion to detain Ferguson's bags. In making this finding the court relied upon questions, answers and statements made between Ferguson and the law enforcement officers as well as the officers' knowledge, experience and training, Ferguson's use of an assumed name on the train ticket, Ferguson's statement that he was coming into Chicago when his ticket's destination was Detroit, the defendant's inconsistent admission and later denial that he was carrying packages for someone else, and Ferguson's furtive and nervous behavior. The court found these facts sufficient to warrant the detention of Ferguson's luggage and noted that: "Within thirty minutes the officers had made a check of the luggage and developed a basis for a warrant which was later issued."

"Our standard of review of a denial of a motion to suppress is well established. We will not disturb the district court's denial of the motion to suppress unless we find that the decision was clearly erroneous. Our inquiry is factually based and requires that we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses."

United States v. Edwards, 898 F.2d 1273, 1276 (7th Cir.1990) (citations omitted).

In addressing the questions of whether police officers' actions were proper in either their initial contact and meeting with Ferguson or the later brief detention of his luggage, we must resolve whether there was a "seizure" of either his person or his luggage for purposes of the Fourth Amendment. In United States v. Mendenhall, 446 U.S. 544, 553–55, 100 S.Ct. 1870, 1876–78, 64 L.Ed.2d 497 (1980), the Supreme Court discussed the concept of "seizure" under the Fourth Amendment:

"We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' United States v. Martinez–Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. 'Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. Haynes v. Washington, 373 U.S. 503, 515 [83 S.Ct. 1336, 10 L.Ed.2d 513].' Schneckloth v. Busta-

---

3. Nonetheless, we must view the trial court as having impliedly rejected any contention that the encounter was constitutionally defective. We are convinced from the actions of the trial court that the court was of the opinion, as we are, that the encounter at the station was consensual. Furthermore, had it not been consensual, the trial court would have granted the motion to suppress. We also note that, even though Ferguson's attorney argued the issue of consensual nature of the meeting between Ferguson, Boyle and Kosik in the trial court, he never specifically requested a finding from the district court on the issue of whether consent was given after the trial court refused his motion to suppress.

*monte,* [412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854].

"We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person."

(Citations and footnote omitted). For purposes of determining whether there has been a seizure under the Fourth Amendment, we have described the various categories of police-citizen meetings as follows:

"The Supreme Court has developed three categories for police-citizen encounters in relation to the Fourth Amendment. We thoroughly set forth those categories in *United States v. Black,* 675 F.2d 129, 133 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment 'seizure,' but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. *United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The third category involves no restraint on the citizen's liberty, and is

characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment. *United States v. Mendenhall,* 446 U.S. 544, 553–55, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980); *Terry,* 392 U.S. at 19, n. 16, 88 S.Ct. at 1879, n. 16."

*United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991).

The government asserts that Boyle, Kosik, and Abbott's encounter with Ferguson was consensual, thus, requiring no demonstration of reasonable suspicion of criminal activity. In *United States v. Edwards,* we observed:

"Law enforcement officers 'do not violate the fourth amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.' *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Notorianni,* 729 F.2d 520, 522 (7th Cir.1984). In this sort of police/citizen encounter, 'the degree of suspicion that is required is zero.' *United States v. Serna–Barreto,* 842 F.2d 965, 966 (7th Cir.1988)."

*Edwards,* 898 F.2d at 1276. We went on to note:

"The proper test for determining whether a given encounter rises to the level of a fourth amendment seizure is 'if, in the totality of the circumstances, a reasonable person would not believe that his freedom of movement is restrained, or believes that he remains at liberty to disregard a police officer's request for information, a seizure has not occurred.' *United States v.* [*Espinoza–Alvarez* ], 839 F.2d 1201, 1205 (7th Cir.1987) (quoting *United States v. Dyer,* 784 F.2d 812, 815 (7th Cir.1986))."

*Id.*

■ In the instant case Detective Boyle asked Ferguson whether he might ask him

a few questions and after the defendant acquiesced, proceeded to question him and he responded. As in *Edwards:* "The encounter occurred in a public place and there is no evidence that the questioning was intense or repetitive." *Edwards,* 898 F.2d at 1276. Here the meeting took place in an area open to the general public in a train depot. Furthermore, Ferguson was advised that "he was not under arrest and that he was free to leave at anytime," *Edwards,* 898 F.2d at 1276, and, in fact, Ferguson did depart the station prior to the canine sniff of his luggage. *Compare Johnson,* 910 F.2d at 1509 (rejecting argument that defendant did not believe she could leave when "the uncontroverted evidence is that [the defendant] did leave the station without hindrance from any of the supposedly intimidating officers"). The officers were not in uniform, neither displayed guns nor handcuffs, did not use force and thus there was no seizure of Ferguson's person. Thus, it is clear from the facts set forth in the record that the meeting between Ferguson and the officers was consensual, and, thus, permissible under the Fourth Amendment as the defendant felt he was free to go and, in fact, did depart before the luggage sniff. *Accord United States v. Berke,* 930 F.2d 1219, 1221–22 (7th Cir.1991) (holding that contact between police officers and defendant in a train depot was voluntary where the defendant "was approached in a public place and was told that he was not under arrest," was informed "that he was not required to consent [to the search of his bags] and that he was free to leave," and where "there was no evidence of coercion or physical restraint."); *Johnson,* 910 F.2d at 1508–09 (holding that brief voluntary encounter between a defendant and police officers in a train station did not "restrain [the defendant's] liberty in any way"); *United States v. Sterling,* 909 F.2d 1078, 1081–83 (7th Cir.1990) (holding that conversation was consensual where defendant "was free to leave," officers requested identification and airline ticket receipt, initial meeting was only five to ten minutes, subsequent contact only lasted a few minutes and all conversations took place in public area of airport terminal); *Edwards,* 898 F.2d at 1276–77 (Contact between officers and defendant consensual where defendant was stopped in the open public area of the train depot, asked general questions which were neither intense nor repetitive and where defendant was told that he was not under arrest and free to leave at any time).

■ Based upon all the facts, circumstances and statements in the record we are convinced that the encounter and interview in the railroad station was consensual, we must now proceed to determine whether there existed reasonable suspicion to support the brief detention of Ferguson's luggage for the sniff by narcotics-trained canines. As noted above, Ferguson's bags were not detained until information had been elicited from Ferguson and he had been given a receipt for his luggage.

"It is well recognized that a brief, warrantless detention of property for further investigative purposes does not violate the fourth amendment if the detention is based upon reasonable suspicion. *United ed States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); *United States v. Skidmore,* 894 F.2d 925 (7th Cir.1990). There is no 'litmus test' for evaluating reasonable suspicion; rather each instance of police conduct must be judged for reasonableness 'in light of the particular circumstance.' *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)." *Edwards,* 898 F.2d at 1277. In *Edwards* we upheld a brief detention of luggage for a sniff by narcotics-detecting dogs when the facts demonstrated:

"(1) Edwards arrived in Chicago from Los Angeles, a major narcotics distribution center; (2) upon arriving he repeatedly made eye contact with the officers and, rather than immediately exiting the station, stopped to have a brief discussion with a man in a small hallway within the terminal; (3) he then walked several yards behind that man in an apparent attempt to conceal that he was not travelling alone; (4) the defendant told the officers that he was travelling with other men who were also present in

the terminal; (5) during questioning, he became visibly nervous as his hands trembled and he started stuttering after he was told that the officers were part of a narcotics investigation; (6) when asked about his travels he responded that he had been showing a Jamaican friend around California and that 'they' were now returning to Ohio. In contrast, his travelling companion told Agent Orr that he was in Chicago visiting friends; (7) his companion possessed three one-way tickets, all in the defendant's name, and all providing for travel from Los Angeles to Chicago to Indianapolis; (8) the tickets had been paid for in cash; and (9) when the agents asked the defendant whether his luggage contained narcotics he first responded 'no' but then quickly equivocated that someone else could have had access to his bags."

898 F.2d at 1277.

In *Johnson*, a case also involving contact between police and a drug courier at Union Station, the court described *Edwards* as follows:

"The facts in *Edwards* bear a striking resemblance to our own. Edwards was stopped at Union Station in Chicago after arriving on an Amtrak train from the source city of Los Angeles. *Edwards*, 898 F.2d at 1277. He looked around nervously and appeared shaken when stopped by officers. *Id.* His ticket was paid for in cash. *Id.* The officers asked if they could speak with Edwards, and he consented. *Id.* at 1275. They asked to search his bag but told him he could refuse to consent. *Id.* He refused. *Id.* The officers told him he was not under arrest and that he could leave at any time. *Id.* The officers detained his luggage for a drug sniff by a narcotics dog. *Id.* at 1274. Edwards left before the drug sniff. *Id.* at 1275. The sniff was positive, and after obtaining a search warrant, the officers recovered cocaine and marijuana from his suitcase. *Id.* at 1274."

*Johnson*, 910 F.2d at 1509.

As in *Johnson*, this case presents a set of facts almost identical to *Edwards*. As in *Edwards*, the defendant Ferguson arriving from Los Angeles, a major narcotics distribution center carrying a bag secured with a combination padlock. In addition, Ferguson was traveling under an assumed name and stated "he was coming to Chicago" even though his ticket listed his intended destination as Detroit. Furthermore, Ferguson gave conflicting answers to the detective's question concerning whether he had been given items to carry in his suitcase and appeared furtive, nervous, and avoided eye contact both when carrying his baggage and during a short period of general questioning. The entire period of questioning of Ferguson by one officer in the presence of another, neither of whom were in uniform, took place in a public area in a well traveled train station without any show of force, such as the display of pistols and handcuffs. As in *Edwards:* "Given that the officers were entitled to assess the totality of the defendant's conduct in light of their own experience, we find that these factors, in the aggregate, provide ample basis for reasonable suspicion by the officers." 898 F.2d at 1277 (citation omitted). Because we are of the opinion that the encounter between Ferguson and the law enforcement officers was consensual and further that the police possessed more than the reasonable suspicion necessary to briefly detain Ferguson's luggage for a sniff by narcotics-detecting canines, the trial court appropriately denied the motion to suppress.

## IV. SUFFICIENCY OF THE EVIDENCE

Ferguson goes on to challenge the sufficiency of the evidence to support his conviction for possession of cocaine with intent to distribute. He argues that the evidence failed to demonstrate that he knew that cocaine was in the locked bag and asserts that he "could have been set up to unknowingly carry the locked bag filled with cocaine, as he would have never put photos of himself and his own personal mail in the bag if he knew it also contained twenty pounds of cocaine."

"'In evaluating [a defendant's] sufficiency of the evidence challenge, we note that [he] bears a heavy burden. Initially, we "review all the evidence and all·the reasonable inferences that can drawn from the evidence in a light most favorable to the government."' *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984)) [*cert. denied*, 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989)]. 'The test is whether after viewing the evidence in the light most favorable to the government *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' *Pritchard*, 745 F.2d at 1122 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original))."

*United States v. Herrero*, 893 F.2d 1512, 1531 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990). A jury need not accept a defendant's self-serving explanation of the facts as "we have recognized the jury's freedom in weighing the evidence with which it is presented, to choose between interpretations of this evidence favorable to either the government or the defendant." *United States v. Diaz*, 876 F.2d 1344, 1354 (7th Cir.1989). As we observed in *United States v. Zanin*, 831 F.2d 740, 745 (7th Cir.1987):

"Phyllis Zanin argues that all conversations in which she participated are susceptible to an innocent explanation. This may or may not be true—but it is irrelevant. The existence of an innocent explanation does not foreclose a jury from finding guilt beyond a reasonable doubt."

If the jury had so desired it had the opportunity to believe the unlikely story that someone placed over 19 pounds of cocaine worth $1,800,000 in Ferguson's padlocked baggage with a magic key without his knowledge. But, jurors confronted with evidence that Ferguson was carrying over 19 pounds (nine kilograms) of cocaine, a quantity too large for his personal use, in his locked luggage bag, that he was traveling under an assumed name on a train originating in a drug source city and carrying a train ticket with a destination other than the one that he stated in his answers to police, could reasonably believe that the drugs were possessed knowingly with the intent to distribute. The jurors' conclusion is further supported by Ferguson's equivocal and evasive answers to questions posed by the narcotics officers and the nervous behavior he exhibited during this questioning. Under these circumstances a rational jury could find beyond a reasonable doubt that Ferguson knowingly possessed over nineteen pounds of cocaine valued over $1,800,000 with intent to distribute and we hold that there was sufficient evidence to support his conviction.

## V. DENIAL OF MISTRIAL

■ Prior to trial Ferguson moved *in limine* to bar evidence or argument on the question of his refusal to consent to the search of his luggage. In response to the motion the following colloquy occurred:

"MR. GAIR: [Government Attorney] Judge, just to clarify, we are not going to mention the refusal to consent in our opening. I think there is an analogy to the Doyle line of cases, because the defendant clearly had a right not to consent. We are going to instruct the agent not to mention it in his direct examination.

I don't know what the cross is going to be. If the cross tends to suggest that Mr. Ferguson was cooperative throughout, there may have to be a reassessment of this point, but at this point I am going to instruct Agent Boyle not to mention the fact that he asked for and was refused consent to search the bags.

MR. ROBERTSON: [Ferguson's Attorney] Your Honor, in some respects the cross may suggest that he was cooperative at certain times, but I really don't think in view of Doyle—

THE COURT: We will deal with that at the time."

The court made no further ruling on Ferguson's *in limine* motion.

During direct examination concerning his meeting with Ferguson at Union Station, the prosecutor asked Detective Boyle, "What did you do next?," to which Boyle answered, "I then asked Mr. Ferguson if he would allow me to search his luggage." The question concerning consent occupied less than one-half page of a double spaced 170–page trial transcript. The prosecutor immediately requested a sidebar where the following discussion took place:

> "MR. GALLO: [Government Attorney] I instructed Detective Boyle not to get into the consent for the search issue, and apparently there has been some confusion. I would just request, your Honor, that I ask another question and that that last response be stricken, and I think they will get the message and we will do it without any damage. I don't think there has been any damage at this point. We won't get into whether or not the defendant consented for a search of his bags.
>
> MR. ROBERTSON: [Ferguson's Attorney] Your Honor, on behalf of the defendant we did take that issue up yesterday. I have done some research on it and the reason that I fronted it, so to speak, with the Court is because I was afraid that this would happen, so at this time I move for a mistrial on behalf of the Defendant Ferguson. I don't think the bell can be unrung if he just leaves the area right now no matter what the Court tells the jury. There is speculation in the jury's mind and since that would be the only, in our position direct evidence that they would have of his young man's guilty knowledge, I think the damage has been done and I would move for a mistrial. He should have stayed away from that area."

The trial court denied Ferguson's mistrial motion and proceeded to give the jury the following curative instruction: "[T]he jury will disregard the last question, which hasn't been answered in any event." [4] The court also addressed the objection in its final instructions given before the jury retired for deliberation, where he instructed the jury: "You are to disregard any evidence to which I sustained an objection or which I ordered stricken."

In determining whether a court should declare a mistrial rather than merely instruct the jury to disregard evidence on an improper subject matter, we have held that:

> "A trial judge has broad discretion in determining when a cautionary instruction, as opposed to a mistrial, can prevent any possible prejudice. *United States v. Mealy*, 851 F.2d 890, 902 (7th Cir.1988). The trial judge is often in the best position to make this determination in the context of the entire trial. *Id.* Much of the appellant's argument seems to rest on the assertion that a cautionary instruction can under no circumstances serve its intended purpose. Yet this court has held on several occasions that such instructions can be sufficient to avoid the possibility of unfair prejudice."

*United States v. McClellan*, 868 F.2d 210, 217 (7th Cir.1989). *See also United States v. Ashford*, 924 F.2d 1416, 1423 (7th Cir. 1991) ("Our review of a district court's exercise of its 'broad discretion with regard to declaring mistrials ... is limited to whether the denial of a motion for mistrial constituted an abuse of [its] discretion.' ") (quoting *United States v. Beverly*, 913 F.2d 337, 351 (7th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 766, 112 L.Ed.2d 786 (1991)). "We generally must assume that the jury followed the court's cautionary instruction." *United States v. Mealy*, 851 F.2d 890, 903 (7th Cir.1988).

The government did not elicit from Detective Boyle testimony concerning Ferguson's non-consent to the search and took immediate measures to eliminate any prejudice that resulted from Boyle's single isolated statement concerning a request for

---

**4.** Although the record reflects that the court was in error when it stated that no material answer had been given, it is clear that the only answer in the record was merely that Boyle had asked for consent to search Ferguson's bags and that nothing had been stated concerning Ferguson's decision to agree or refuse to agree to a search.

consent to search. Immediately thereafter, the court gave a curative instruction and furthermore addressed the issue in his final instructions. In responding to a challenge of a court's refusal to grant a mistrial in a case where a witness gave improper testimony on three occasions, we observed that:

> "From our examination of the record, we find ourselves unpersuaded that an unfair trial resulted from these three instances in testimony contained in a transcript of more than 350 pages, recognizing that 'instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently.' *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). We have no reason for thinking from this record that the Government deliberately sought these remarks as a part of their case which was a strong case of guilt without the items in question. While their uttering before the jury may have prevented this from being a perfect trial, a perfect trial is not required but only a fair trial and in view of the prompt and decisive action of the district court we do not believe that the defendants were denied a fair trial."

*United States v. Miroff*, 606 F.2d 777, 782 (7th Cir.1979), (footnote omitted), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980). "As the Supreme Court has 'repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."' *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986))." *United States v. Grier*, 866 F.2d 908, 934 (7th Cir.1989). In this case, as in *Ashford*, "rather than granting a mistrial, the district court chose to honor the 'almost invariable assumption of the law that jurors follow their instructions.'" *Ashford*, 924 F.2d at 1423 (quoting *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 1706, 95 L.Ed.2d 176 (1987)). The trial court's appropriate exercise of its discretion in electing to provide a curative jury instruction, rather than declaring a mistrial, following Detective Boyle's innocuous testimony that he requested Ferguson's consent to search his luggage was sufficient to insure Ferguson a fair trial, particularly because Boyle was never asked any further questions on the subject matter. Further, the jury was never advised that Ferguson refused to give consent to a search.

Even if the trial court had erred in denying Ferguson's mistrial motion, we would not reverse its judgment because such an error would have been harmless beyond a reasonable doubt. The harmless error rule "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence...." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). We have held constitutional errors harmless even in the absence of "overwhelming" evidence, focusing on the "impact of the objectionable material on the jury's verdict" as a means to determine whether "the jury would have convicted [the defendant] absent [the constitutional error]." *Fencl v. Abrahamson*, 841 F.2d 760, 769 (7th Cir.1988).

The evidence supporting Ferguson's conviction for possession of cocaine with intent to distribute was overwhelming as he possessed luggage containing nineteen pounds of cocaine, valued at $1.8 million, an amount far too large for personal consumption, under circumstances where he had arrived on a train from a drug source city, traveled under an assumed name, acted in a suspicious and nervous manner before and while being questioned by law enforcement officers and provided evasive and/or untruthful information and answers to the drug agents' questioning. In light of the clear and convincing evidence of Ferguson's physical control over nineteen pounds of cocaine under circumstances that demonstrate he was a drug courier, the evidence supporting his guilt was "overwhelming." Furthermore, we are of the belief that Detective Boyle's mere statement that he asked Ferguson's consent to search his luggage was of no consequence at all to the jury's verdict but if it did in fact have any impact it was minimal at best. Thus, in

light of his possession of a large amount of cocaine under circumstances reflecting his role as a drug courier, even if we were to find that the court improperly denied a mistrial, which we do not, any error would have been harmless beyond a reasonable doubt.

## VI. EVIDENTIARY RULINGS

■ Ferguson objects to the trial court receiving in evidence a business card and scrap of paper with beeper numbers inscribed thereon, as well as photographs of Ferguson with luxury automobiles, which were seized from the cocaine-filled locked bag Ferguson carried into Union Station. He contends that the court should not have admitted this evidence because its probative value was substantially outweighed by the danger of unfair prejudice under Rule 403 of the Federal Rules of Evidence.

Rule 403 of the Federal Rules of Evidence provides that:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

"It is well established that 'a trial judge's assessment of relative probative value and unfair prejudice is generally accorded great deference because of his first-hand exposure to the evidence and his familiarity with the course of the trial proceeding.'" *United States v. Briscoe,* 896 F.2d 1476, 1498 (7th Cir.) (quoting *United States v. Liefer,* 778 F.2d 1236, 1244 (7th Cir.1985) (citation omitted)), *cert. denied,* —— U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). Furthermore, it is recognized that any evidence of a crime carries with it a degree of prejudice. *See United States v. Sophie,* 900 F.2d 1064, 1076 (7th Cir.) ("[A]ll probative evidence is prejudicial to the party against whom it is introduced."), *cert. denied,* —— U.S. ——, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990).

In order to convict Ferguson, the government was required to demonstrate that he possessed cocaine with the intent to distribute. Evidence of Ferguson's involvement in drug trafficking was important in establishing the element of Ferguson's intent to distribute. The government presented expert testimony that drug traffickers frequently utilize beepers in the conduct of their illicit business. The presence of beeper numbers on Ferguson's person demonstrates that he may have been involved with drug traffickers who used beepers. In *United States v. Solis,* 923 F.2d 548, 550–51 (7th Cir.1991), we rejected a defendant's attempt to exclude a federal agent's expert testimony on the use of beepers, observing that "courts in other circuits have recognized the value of expert testimony on beepers and other tools of the drug trade," 923 F.2d at 550, and that the "presence of beeper numbers helps complete the picture [of an intent to distribute cocaine]—*if* the trier of fact is aware of the role that beepers often play in the conduct of illegal drug trade." *Id.* at 551 (emphasis in original). Although Ferguson counters that beepers have many legitimate uses, he was permitted to establish this point during his cross-examination of the government's expert. Thus, in light of the jury's awareness of beepers' many legal uses as well as their use in drug trafficking, any prejudice the defendant suffered from the admission of the beeper numbers found in his luggage was not unfair and was certainly outweighed by the usefulness of this evidence in establishing his involvement in drug trafficking with the use of beeper numbers and his intent to distribute the cocaine he possessed.

■ With respect to the photographs of Ferguson with luxury automobiles that were seized from his locked, cocaine-filled bag, there was never an assertion that he owned these cars. Rather, the pictures were introduced merely to demonstrate that the photos were pictures of Ferguson and were part and parcel of his belongings he transported in his locked bag, in order to establish Ferguson's connection (relation to) with and control over the bag and its contents, thereby supporting the government's position that he (Ferguson) was in possession of cocaine. The photographs

were mixed in with the remainder of Ferguson's property. In light of the fact that the government never argued that Ferguson owned the automobiles and introduced the photographs merely for the purpose of demonstrating that the pictures of Ferguson were contained in the locked bag, thereby establishing Ferguson's control over the locked bag's contents, the trial court did not abuse its discretion in concluding that the photographs' probative value in establishing the connection between Ferguson and the locked bag outweighed any unfair prejudice to Ferguson that their admission might have caused.

## VII. GOVERNMENT'S CLOSING ARGUMENT

■ Ferguson asserts that he was deprived of a fair trial as a result of the government's statements in rebuttal closing argument that informed the jurors that they could "make a difference in the fight against drugs." The prosecutor stated:

"[N]obody has to tell you about the scourge of drugs in our society today and the effect it is having on the social fabric today. I am not going to try to lecture you about that, although right now I feel a sudden flush of energy to do so.

You may hear that people, individual people, don't have a chance to make a difference in the fight against drugs. Ladies and gentleman, that is just wrong. The evidence in this case is overwhelming. $1.8 million of cocaine was headed for the streets. Detective Boyle, a fine law enforcement officer, stopped it. Here is your chance to do something."

In evaluating claims for a new trial based on allegedly improper prosecutorial closing argument, we have observed that: "Defendants are entitled to a new trial only if the government's comments were improper ones that prejudiced the defendants' rights to a fair trial.... In determining whether comments prejudiced the defendants' right to a fair trial, however, the comments must be viewed in the context of the entire trial." *United States v. Still-*

*well*, 900 F.2d 1104, 1112 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990). We have described the applicable analysis as follows:

"This court's review of a claim of prosecutorial misconduct follows a bifurcated analysis. First, this court examines the challenged remark in isolation to determine whether it was improper. If the court concludes that the remark was improper, the remark is evaluated in light of the entire record to determine whether it deprived the defendant of a fair trial."

*United States v. Spivey*, 859 F.2d 461, 465 (7th Cir.1988).

Examining the government's remarks in isolation, we have recognized that:

"A prosecutor may stress to the jury the seriousness of drug charges and comment on the gravity of this country's drug problem. *United States v. Zanin*, 831 F.2d 740, 743 (7th Cir.1987). Indeed, we have found appropriate statements referring to the threat of drugs to 'the children of the families' to whom the defendants were selling drugs, *Zanin*, at 743, ' "to our children and friends," ' *United States v. Zylstra*, 713 F.2d 1332, 1340 (7th Cir.), *cert. denied*, 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983), and 'to the lives and well-being of our children,' *United States v. Peco*, 784 F.2d 798, 810 (7th Cir.), *cert. denied*, 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986). In each of these cases, ... the prosecutor was referring to the threat of drugs to our society as a whole. *See Zanin*, at 743 (quoting *Zylstra*, 713 F.2d at 1340)."

*United States v. Dominguez*, 835 F.2d 694, 700 (7th Cir.1987). As we observed in *United States v. Zylstra*, 713 F.2d 1332, 1340 (7th Cir.), *cert. denied*, 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983):

"During his closing argument the prosecutor made a reference to the 'company's' bringing in '200,000 pounds of marijuana into our country for distribution to our children and friends.' Based upon our reading of the allegedly improper statement, it appears that the prosecutor was making a reference to the 'compa-

ny's' threat to *our society* as a whole ('families' and 'friends' used as generalities) rather than to any individual's particular family and friends. A prosecutor can impress upon the jury the seriousness of the charges and a comment and the gravity of the drug problem in this country is certainly not inappropriate."

(Emphasis in original). But, we have recognized "that 'references to individuals' particular family and friends' are inappropriate." *Dominguez,* 835 F.2d at 700 (quoting *Zanin,* 831 F.2d at 743).

The government's statement in the record presents no difficulty under the case law set forth above. The declaration was merely a reference to society's drug problem and Ferguson's role in exacerbating this global problem. The government permissibly asked jurors to make a difference in the fight against this significant evil without making specific references to the drug problem's effect on particular individuals. Under our decisions in *Dominguez, Zanin, Zylstra,* and *Peco,* the government's reference to society's drug problem was proper and, thus, could not have deprived Ferguson of a fair trial.[5]

In fact, we have also emphasized that a trial judge during sentencing may take into account the realities of the drug problem:

> "Faced with the responsibility of sentencing Gomez, the judge could not, and would have been remiss if he did, ignore the realities of the case. He denounced drug trafficking as 'despicable business,' as do we. He noted that Gomez came here illegally and not to escape governmental suppression or poverty. The judge expressed concern as well as the concerns of the people of the district about the increasing number of people from Latin countries bringing illegal drugs into the district. He expressed the hope that the sentence imposed would serve as a deterrent to others who might contemplate following in the footsteps of Gomez. In our view the court's explana-

tion of his sentence, far from being a constitutional violation, was well stated."

*United States v. Gomez,* 797 F.2d 417, 420 (7th Cir.1986).

The trial court did not commit reversible error and evidence in the record was more than sufficient to support the jury's verdict of guilt.

AFFIRMED.

---

**5.** Because this statement was proper in isolation, it is unnecessary for us to reach the second part of the bifurcated analysis in *Spivey* and determine whether, in light of the entire record, the statement deprived Ferguson of a fair trial.