**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jeffrey KELLY, Defendant–Appellant.**

**No. 92–3268.**

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1993.

Decided April 22, 1993.

Richard N. Cox, Asst. U.S. Atty., Danville, IL (argued) for U.S.

Stephen Ryan, Ryan, Cini, Bennett & Radloff, Mattoon, IL (argued), for Jeffrey Kelly.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and REAVLEY, Senior Circuit Judge.[1]

BAUER, Chief Judge.

A jury convicted Jeffrey Kelly of being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On appeal, he challenges both his conviction and his sentence. We affirm.

## I. Facts

The evidence presented at trial, taken in the light most favorable to the government, supports the following facts. Jeffrey Kelly was stopped for speeding on November 16, 1991. Illinois State Trooper Gregory Dixon, the officer who stopped him, noticed that neither Kelly nor either of his two passengers was wearing a seat belt. Dixon asked each man to identify himself. Dixon asked Kelly to come with him to the squad car. Kelly sat in the front passenger seat of Dixon's squad car as Dixon prepared warning tickets for speeding and failure to wear a seat belt. The name given by one of the passengers was not in police records, so after he wrote Kelly's tickets, Dixon returned to the car to question the mystery passenger. Dixon asked the passenger to join him in the squad car so he could prepare a warning ticket for the seat belt violation. As the passenger left the car, Dixon saw an open bottle of brandy on the floor in the back seat between the feet of the second passenger. Dixon asked for the alcohol, and after it was handed over, he decided to search the car to determine whether there was any more alcohol. Before searching the car, Dixon called for back-up. After two more officers arrived, Dixon asked Kelly and the first passenger to get out of the car so he could search it further. They agreed. The mystery passenger was seated in Dixon's squad car. As the other officers kept an eye on Kelly and his passengers, Dixon searched the car. He found two glass tubes containing a crystalline

1. The Honorable Thomas Reavley, Senior Judge for the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

residue, and a hemostat[2] containing marijuana residue.

Dixon recognized the tubes as pipes for smoking crack cocaine, and asked Kelly if there were drugs in the car. Kelly said the tubes were from his fish aquarium and denied that any drugs were in the car. Dixon asked Kelly if he had drugs on his person, and Kelly said no. Dixon asked Kelly if he could search him, and Kelly again denied having drugs, but gave Dixon permission to search him for drugs. According to Dixon, before he began to search Kelly, Kelly reached into his pants pocket and pulled out a fistful of change which contained several .22 caliber cartridges.

When he saw the cartridges, Dixon became concerned that Kelly might have a gun. Dixon asked Kelly if he had a gun. Kelly did not answer; Dixon asked if the gun was in the trunk. Kelly then said it was "on me," and gestured with his right leg. In response to Dixon's question, Kelly said the gun was loaded. The gun was stuffed into the top of Kelly's right tennis shoe against the inside part of his leg. Kelly's pants leg covered the gun. Dixon took the gun and arrested Kelly. After the arrest, Dixon advised Kelly of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Kelly then admitted that the gun was his, and said he had purchased it for protection.

After his arrest, Kelly moved to suppress the gun and the statements he made to Dixon after his arrest. Kelly contended that his arrest was warrantless and not supported by probable cause, and that Dixon improperly interrogated him before advising him of his *Miranda* rights. Because the interrogation was unlawful, he contended, all of his responses should be suppressed. He also argued that the search was illegal, so the gun should have been suppressed as well. After a hearing, the district court denied the motion to suppress. The court found Dixon's search of the car was supported by probable cause and that Kelly was not in custody when

Dixon questioned him. Order of 6/26/92 at 4–5, Record Document ("R. Doc.") 21.

At trial, one of the passengers testified that he saw Dixon take a revolver from the car, not from Kelly, during the search. Kelly admitted that he has five prior felony convictions. He denied that he carried the cartridges or gun on his person. Kelly agreed with his passenger that Dixon took the gun from the car, but disavowed any knowledge of its presence. Kelly also denied making any statements about the gun after his arrest to Dixon. The jury, however, apparently failed to credit this testimony and convicted Kelly after thirty minutes of deliberation. *See* Trial Transcript at 202–03.

On appeal, Kelly contends that (1) the district court erred in refusing to grant his motion to suppress; (2) the prosecutor made improper statements during his rebuttal argument; (3) the evidence is insufficient to support the jury's verdict; and (4) his sentence was improperly calculated. We consider each argument in turn.

## II. Analysis

### A. Motion to Suppress

■ We review a district court's factual and legal determinations on a motion to suppress for clear error. *United States v. Spears*, 965 F.2d 262, 271, 277 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992). Kelly contends that Dixon's pre-arrest questions amounted to a custodial interrogation subject to the requirements imposed by *Miranda* because his freedom was substantially restricted by the circumstances of the traffic stop. In *Miranda*, the Supreme Court explained that a custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. But the Court in subsequent cases has also cautioned against according "talismanic power" to

2. A hemostat is a long-handled clamp used to control bleeding in surgery.

this phrase. *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138, 3148–49, 82 L.Ed.2d 317 (1984). "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered that decision are implicated." *Id.* In *Berkemer,* the Court held that persons arrested for minor traffic offenses are entitled to *Miranda* warnings, but that an officer who merely questions a stopped motorist need not first give the warnings. *Id.* at 442, 104 S.Ct. at 3151.

 In order for the requirements of *Miranda* to apply, the defendant must have been subjected to a "restraint on his freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983); *United States v. Hocking,* 860 F.2d 769, 772 (7th Cir.1988). Whether a suspect was in constructive custody depends upon the totality of the circumstances. *Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520. The test is "not whether the defendant was under the subjective belief that his or her movements were restricted, but whether a reasonable person in the defendant's position would believe that he or she was free to leave." *United States v. Lennick,* 917 F.2d 974, 977 (7th Cir.1990). Further, the Supreme Court has expressly rejected the contention that a noncustodial situation may be converted to a custodial one simply because the questioning occurred in a "coercive environment." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Id.* We have expressly rejected the assertion that any statement made by a defendant while he is under some type of supervision *"ipso facto"* constitutes custodial interrogation. *Schiro v. Clark,* 963 F.2d 962, 974 (7th Cir.1992), *petition for cert. filed* (Feb. 5, 1993).

We can find no evidence in the record to support Kelly's contention that his freedom of movement was restrained in a manner equivalent to that associated with a formal arrest. The Supreme Court has explained that *Miranda* is designed to preserve the constitutional privilege against self-incrimination "during incommunicado interrogation of individuals in a police-dominated atmosphere." *Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990). The elements the Court has focused on are coercion or compulsion, particularly in private, by government officials who appear to control the suspect's fate. *Id.* at 296–97, 110 S.Ct. at 2397.

The Court's ruling in *Berkemer* is instructive. McCarty was pulled over by a police officer because his car was weaving. 468 U.S. at 423, 104 S.Ct. at 3141. The officer asked McCarty to step out of his car, and concluded that he would charge him with a traffic offense. The officer did not inform McCarty, however, and proceeded to administer a field sobriety test. *Id.* at 423, 104 S.Ct. at 3141. McCarty failed the test and the officer asked him if he had used intoxicants. McCarty admitted that he had consumed two beers and smoked some marijuana. His speech was slurred. The officer arrested McCarty and took him to jail. A blood alcohol test revealed no evidence of alcohol in McCarty's blood, and the officer questioned him again. *Id.* He asked McCarty whether the marijuana he smoked had been treated with anything. McCarty answered negatively. He was charged with operating a motor vehicle while under the influence of alcohol and/or drugs. The officer never gave McCarty *Miranda* warnings.

McCarty moved to suppress all of his statements to the arresting officer because of the officer's failure to give the *Miranda* warnings. 468 U.S. at 424, 104 S.Ct. at 3142. Although the Court ruled that his post-arrest statements should be excluded, it found that McCarty was not entitled to *Miranda* warnings before he was arrested. *Id.* at 441, 104 S.Ct. at 3151. The Court found that the initial stop did not render McCarty in custody, and that he was not subject to restraints comparable to a for-

mal arrest at anytime between the initial stop and the actual arrest. *Id.* There was only a short time between the stop and the arrest and the officer never informed McCarty that his detention would not be temporary. Although the officer decided to arrest McCarty the moment he stepped out of his car, he never informed McCarty of this decision, and the Court ruled that "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time...." *Id.* at 442, 104 S.Ct. at 3151. The Court summed up the facts McCarty presented: "a single police officer asked respondent a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists. Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest." *Id.* at 442, 104 S.Ct. at 3151 (footnote omitted).

At oral argument, counsel for Kelly argued that *Berkemer* controls our analysis here, and we agree. Officer Dixon's roadside questioning of Kelly, in the presence of the passengers and passing motorists does not constitute a custodial interrogation. Only a short period of time elapsed between the initial stop and Kelly's arrest—25 or 30 minutes. Transcript of Suppression Hearing at 31, R. Doc. 29. There are no indications that police conduct overcame Kelly's will. *See Beckwith v. United States,* 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (considering factors influencing voluntariness of suspect's statements). Kelly argues that Dixon's decision to charge him with possession of marijuana before Dixon discovered the gun shows that Kelly was not free to leave the scene, and therefore, was in custody. Appellant's Brief at 14. But in *Berkemer,* the Court rejected the argument that an officer's unarticulated decision could effect the determination whether a suspect was in custody. 468 U.S. at 442, 104 S.Ct. at 3151.

■ Moreover, once Kelly produced the .22 cartridges in response to Dixon's query about drugs, Dixon was permitted to pursue the question of the location of the gun under the public safety exception to *Mi-*

*randa*'s requirements. *See New York v. Quarles,* 467 U.S. 649, 658–59, 104 S.Ct. 2626, 2633, 81 L.Ed.2d 550 (1984) (officers confronted with immediate necessity of ascertaining whereabouts of gun need not recite *Miranda* warnings before questioning suspect). *See also United States v. Simpson,* 974 F.2d 845, 847 (7th Cir.1992) ("[C]onsiderations of safety to law enforcement officers and others nearby justify an officer's inquiry about the location of a gun without first advising a suspect of his *Miranda* rights."), *cert. denied,* — U.S. ——, 113 S.Ct. 1326, 122 L.Ed.2d 711 (1993); *Andersen v. Thieret,* 903 F.2d 526, 531 (7th Cir.1990) (analyzing arrestee's volunteered statement about weapons). The district court properly denied Kelly's motion to quash his statements because Dixon's questioning did not constitute a custodial interrogation and because of the public safety exception to *Miranda* under *Quarles.*

### B. *Improper Rebuttal Argument*

■ Kelly alleges that two comments made by the prosecutor were improper and prejudicial. These comments were so inflammatory, he contends, the jury's verdict should be reversed and the case remanded for a new trial.

The first comment to which Kelly objects is the Assistant United States Attorney's (AUSA) reference to Julian Macklin's testimony. Macklin was Kelly's mystery passenger. Thompson (the other passenger) and Kelly both testified that the gun Dixon found was not on Kelly's person, but in the passenger compartment of the car. Apparently Kelly's theory of the case was that it was just as likely that the gun belonged to Macklin as Kelly, and the government was just trying to "pin it on" Kelly. Trial Transcript at 189 (Defense's Closing Argument). In response to this argument, during his rebuttal, the AUSA stated:

> You know Mr. Ryan [defense counsel] called Mr. Macklin yesterday as a witness, and I didn't hear him one time ask him was this your gun. He had him right here. He could have asked him.

Macklin might not have told us the truth but he didn't even ask the question.

Trial Transcript at 191.

■ Kelly's counsel did not object to the comment. In order to preserve a question for appellate review, a timely objection must be made at trial stating the appropriate grounds for the objection. *United States v. Lewis*, 954 F.2d 1386, 1391 (7th Cir.1992); *United States v. Livingston*, 936 F.2d 333, 335 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 884, 116 L.Ed.2d 787 (1992). If the issue was not raised at trial, it is waived, and this court will not consider it, absent plain error. *Lewis*, 954 F.2d at 1391 (citing *United States v. Gill*, 909 F.2d 274, 277 (7th Cir. 1990)).

■ There can be no plain error here because this comment was not improper. The prosecutor was not commenting on the defense's failure to produce evidence, but upon the evidence that Kelly produced: Macklin's testimony. Kelly argued that the gun could have belonged to Macklin, but when he called Macklin to the stand, he did not ask him about it. Prosecutors are entitled to comment upon inconsistencies in the defense. *United States v. Sblendorio*, 830 F.2d 1382, 1395 (7th Cir.1987) (citing *United States v. Scott*, 660 F.2d 1145, 1168 (7th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982)), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988). Further, commenting on a defendant's failure to call or ask particular questions of a witness "does not have the effect of shifting the burden of proof unless it taxes the exercise of the defendant's right not to testify...." *United States v. Dahdah*, 864 F.2d 55, 59 (7th Cir.1988), *cert. denied*, 489 U.S. 1087, 109 S.Ct. 1550, 103 L.Ed.2d 853 (1989). Kelly did testify, so the AUSA's comment could not have taxed his Fifth Amendment rights. The AUSA's comment about the inconsistencies in Kelly's defense was entirely proper, and Kelly's objections to it are without merit.

■ Kelly also objects to the AUSA's characterization of Dixon's conduct:

AUSA: You pay your police officers to do what Mr. Ryan would want you to think is something sinister. "Interdiction." Asking questions. God help us if a police officer might ask some questions and find out if people like Jeff Kelly are carrying loaded guns on him or to find if people are carrying open alcohol that they could be drinking and driving down the highway. That's what you pay your police officers for.

Ryan: I would object.

The Court: That's appealing to the emotions of the jury. It's outside the evidence of the case and the jury should disregard that kind of argument.

Trial Transcript at 192. The AUSA's argument was plainly inappropriate. As the district court correctly pointed out, it improperly appealed to the emotions of the jury. Nevertheless, we believe the court's prompt instruction to the jury cured any possible prejudice the comment may have created. Cautionary instructions minimize the risk of potential prejudice from improper remarks. *United States v. Neely*, 980 F.2d 1074, 1085 (7th Cir.1992); *United States v. Jewel*, 947 F.2d 224, 230 (7th Cir.1991). Moreover, our theory of trial relies upon a jury's ability to follow instructions. *United States v. L'Allier*, 838 F.2d 234, 242 (7th Cir.1988). "We cannot, of course, know with certainty what effect [the judge's] curative instruction had upon the jury, but the presumption in our system is that such instructions are taken seriously." *Neely*, 980 F.2d at 1087 (citing *United States v. Napue*, 834 F.2d 1311, 1325 (7th Cir.1987)).

■ A defendant is entitled to a new trial only if the government's comments were improper and prejudiced the defendant's right to a fair trial. *U.S. v. Gonzalez*, 933 F.2d 417, 430 (7th Cir.1991). "We will not lightly overturn a criminal conviction 'on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.'" *United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir.1992) (quot-

ing *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1984). Our analysis proceeds in two steps. Initially, we consider whether the prosecutor's comment was improper. If it was, we then evaluate the remark in light of the entire trial and determine whether it deprived the defendant of a fair trial. *Id.* at 1084. Five factors influence our evaluation of the impact of a prosecutor's improper comment: (1) the nature and seriousness of the prosecutor's misconduct; (2) whether the prosecutor's statements were invited by impermissible conduct of defense counsel; (3) whether the trial court instructed the jury to disregard the statements; (4) whether the defense was able to counter the improper arguments through rebuttal; and (5) the weight of the evidence against the defendant. *Id.; see Darden v. Wainwright*, 477 U.S. 168, 180–82, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986); *United States v. Pirovolos*, 844 F.2d 415, 426 (7th Cir.), *cert. denied*, 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988).

We believe on balance that the *Darden* factors in the government's favor largely outweigh those in Kelly's favor. First, the prosecutor's improper argument was promptly objected to and the jury was instructed to disregard it. "In assessing the effect of improper prosecutorial comment[,] courts have recognized the greatly reduced possibility of harmful prejudice where the inappropriate remark is isolated and the trial judge provides a quick, firm curative admonishment." *Phelps v. Duckworth*, 772 F.2d 1410, 1415 (7th Cir.1985) (en banc), *cert. denied*, 474 U.S. 1011, 106 S.Ct. 541, 88 L.Ed.2d 471 (1985). Second, although the improper statement was not trivial, it was not so inflammatory that in the context of the entire trial it posed a substantial risk of undue prejudice. *Cf. Darden*, 477 U.S. at 180 n. 11, 106 S.Ct. at 2471 n. 11 (no reversal despite prosecutor's comment that, "I wish that I could see him [the defendant] sitting here with no face blown away by a shotgun."); *Neely*, 980 F.2d at 1087. Finally, there was strong evidence of Kelly's guilt. Dixon testified that he removed a gun from Kelly's shoe. Trial Transcript at 37–38. A second trooper who was present when Dixon interviewed Kelly also testified that Dixon took the gun from Kelly. Trial Transcript at 70. The government also produced the gun. Government Exhibit 1, Trial Transcript at 39.

These three factors in the government's favor outweigh the two in Kelly's favor—that his counsel did not invite the comment by improper argument, and that he did not have an opportunity to rebut the comment. Put simply, we do not believe this remark was so prejudicial as to deprive Kelly of a fair trial.

## C. Sufficiency of the Evidence

When a defendant argues that there was insufficient evidence of his guilt, he faces a formidable burden. We review all the evidence in the light most favorable to the government. If we find that any rational jury could have found the defendant guilty, the conviction will be affirmed. *United States v. Jewel*, 947 F.2d 224, 231 (7th Cir.1991). An appellate court will not weigh the evidence or assess the credibility of the witnesses. *United States v. Reiswitz*, 941 F.2d 488, 493 (7th Cir.1991). Under 18 U.S.C. § 922(g)(1) the government need only prove that the defendant has been convicted in any court of a crime punishable by imprisonment for more than a year, and that the defendant possessed a firearm or ammunition that has been shipped or transported in interstate commerce.

As we discussed in our evaluation of Kelly's challenge to the AUSA's rebuttal argument, the evidence in this case is strong. Dixon and another officer testified that Dixon took the gun from Kelly's shoe; Kelly said Dixon took the gun from the car. The jury was entitled to resolve this credibility issue in the government's favor, and we will not disturb this determination. *United States v. Mojica*, 984 F.2d 1426, 1435 (7th Cir.1993); *Reiswitz*, 941 F.2d at 493. Kelly did not contest the gun's movement in interstate commerce, and admitted at trial that he has five prior felony convictions. Trial Transcript at 131. The gist of Kelly's challenge to the evidence is that the officers' testimony was simply unbelieva-

ble. We find nothing inherently unbelievable about Dixon's version of the events—that Kelly was able to conceal the gun partly in his shoe and partly under his pants. Absent "inherently unbelievable" testimony, a jury's credibility determination will stand. *United States v. Jewel,* 947 F.2d 224, 232 (7th Cir.1991). Consequently, we find no reason to disturb the jury's verdict.

### D. Sentencing Challenge

Kelly contends that the district court improperly relied upon his conviction for unlawful delivery of cannabis under the Illinois Cannabis Control Act, 720 ILCS 550/1 (formerly Ill.Rev.Stat. ch. 56½, para. 701), to calculate his base offense level under Sentencing Guideline § 2K2.1(a). "The district court's sentence ... will be affirmed if it results from a proper application of the sentencing guidelines to the facts." *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989). We give "due deference" to the district court's application of the guidelines to the facts. *Id.* (citing 18 U.S.C. § 3742(e)).

Guideline § 2K2.1(a)(1) provides that a base offense level of 26 should be assigned if the defendant has at least two prior felony convictions for a "controlled substance offense." Kelly has a conviction for delivery of cocaine, a violation of the Illinois Controlled Substances Act, 720 ILCS 570/100 (formerly Ill.Rev.Stat. ch. 56½, para. 1100). He concedes this conviction is a proper basis for the calculation of his base offense level. But, he contends, because his marijuana convictions were under Illinois' "Cannabis Control Act" rather than its "Controlled Substances Act," the federal guideline requiring a controlled substance offense forbids reliance upon his marijuana convictions.

We can find no cases which consider this argument, probably because it is patently absurd. It is undisputed that under 21 U.S.C. § 812 Schedule I(c)(17) and 21 U.S.C. § 841, the federal controlled substance statutes and accompanying Guideline § 2D1.1(c), marijuana is a controlled substance. *See, e.g., United States v. Webb,*

945 F.2d 967 (7th Cir.1991) (discussing calculation of sentence for marijuana manufacture under Guideline § 2D1.1), *cert. denied,* — U.S. —, 112 S.Ct. 1228, 117 L.Ed.2d 463 (1992). Kelly's argument, then, is that although the federal statutes and Guidelines define marijuana as a controlled substance, his state conviction for delivery of marijuana cannot be used to calculate his base offense level because the state where he was convicted has named the law punishing marijuana delivery something other than "Controlled Substances Act." Kelly has two prior convictions under the Illinois Cannabis Control Act; each carried a four year sentence. Kelly's semantic challenge to the calculation of his base offense level is wholly without merit, and we affirm his sentence.

### III.

For the foregoing reasons, the judgment of the district court is

Affirmed.