**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Robert CHESKA, Defendant–Appellee.**

**No. 98–2665.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1999.

Decided Jan. 31, 2000.

As Modified March 21, 2000.

Susan E. Cox, Office of the U.S. Attorney, Criminal Div., Mark S. Hersh (argued), Office of the U.S. Attorney, Criminal Appellate Division, Chicago, IL, for plaintiff–appellant.

Gerald P. Boyle, Jonathan C. Smith (argued), Milwaukee, WI, Eugene O'Malley, Chicago, IL, for defendant–appellee.

Before BAUER, CUDAHY and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Robert Cheska was charged with mail fraud in conjunction with a scheme to kill horses for insurance money. He was convicted by a jury, but the district court granted a new trial because of a remark made by the prosecutor during closing arguments. Because of the broad discretion accorded district court judges in deciding whether to grant a new trial, we affirm.

## I.

Cheska and his co-defendant, George Nuber, were charged with using the United States mails to defraud an insurance company in connection with the death of a show horse owned by Nuber. Over the years, Nuber purchased a number of horses from Cheska, a professional horse trainer. Nuber boarded his horses at stables operated by Cheska, and Cheska trained Nuber's daughters and their horses in equestrian activities. Nuber purchased a horse for one of his daughters in the spring of 1986, using Cheska as the agent for the transaction. Nuber paid $6500 for the horse, which was originally named Wanja, then renamed Jolly Roger, and finally renamed Valentino. Apparently, the horse did not work well with Nuber's daughter, and she wanted another horse named Silver Rabbit, which was owned by Cheska's father. Nuber decided to sell Valentino in order to buy Silver Rabbit.

What happened next is in dispute, and the jury ultimately acquitted Nuber on mail fraud charges, so we must assume they were not convinced by the government's version of events as they related to Nuber. In any event, the evidence showed that Nuber had insured Valentino's life for its full value, up to $50,000. In January 1987, Nuber and Cheska attended a horse show in Wisconsin, where Cheska met with Timothy Ray a/k/a Tommy Burns, a longtime friend. Cheska told Burns that Nuber wanted to have Valentino killed and was willing to pay $5000. Burns, who had killed several other horses for insurance money, readily agreed. The two planned for Valentino to be moved to Florida, where Burns was living, so that the killing could be accomplished. After the horse arrived in Florida, Burns electrocuted it in order to make the death appear to be from natural causes. Burns' girlfriend, Lisa Kinney, acted as his lookout.

Nuber submitted a claim to his insurer, including a sworn proof of loss valuing Valentino at $50,000, the policy limit. Nuber claimed he had paid for Valentino with cash and trade-ins worth $50,000, and attempted to establish the value with affidavits and bills of sale. The insurer, apparently skeptical of the value claimed and the circumstances surrounding the death, hired a veterinarian to perform an autopsy. The veterinarian could not determine the cause of death, but found the evidence was consistent with death by electrocution or being struck by lightning. The insurer ultimately refused to pay on the claim, and Nuber sued the insurer in state court. In the course of this lawsuit, Nuber and Cheska told a number of conflicting tales about the value of Valentino, how Valentino was purchased, and what was paid in cash and trade for the horse. Not surprisingly, Nuber lost his case before a jury, and the federal government took an interest in the allegedly false documents Nuber and Cheska created and transmitted through the mails in their attempts to establish the value of Valentino. The government charged Nuber and Cheska with mail fraud. A jury convicted Cheska but acquitted Nuber.

At trial, Tommy Burns testified for the government, as he had in a number of trials relating to the killing of horses for insurance money. It was a topic with which Burns showed a disturbing familiarity. By the time of Cheska and Nuber's trial, Burns had personally killed fourteen other horses at the request of their owners, all for the sake of insurance fraud. Burns struck a very favorable plea agreement, which required him to cooperate with the government in its investigation and prosecution of the crimes in which he took a part. In exchange for his cooperation, Burns received a six month federal prison sentence, which he had already served in full at the time of Cheska and Nuber's trial. Needless to say, Burns was subject to an intense attack on his credibility at Cheska and Nuber's joint trial. In cross-examination and during closing arguments, both defense counsel called Burns'

credibility into question. Counsel for Cheska additionally argued that Lisa Kinney, Burns' girlfriend and lookout, had lied during her testimony at trial as well. In rebuttal, the prosecutor sought to undo the damage with the following remarks:

Why would Lisa Kinney come into federal court and lie? To help Tommy Burns? Tommy Burns' deal is over. Tommy Burns has served his sentence. Tommy Burns has nothing else to gain at this point. Tommy Burns has convicted 23 other people. What is his motivation at this point?

Tr. p. 2401. These remarks drew immediate objections from defense counsel and a motion for a mistrial. The court issued a curative instruction, and took the motion for a mistrial under advisement. After the jury convicted Cheska and acquitted Nuber, Cheska renewed his motion for a mistrial, and this time, the district court granted the motion and ordered a new trial.

The district court found that the remark that Burns had convicted 23 other people was literally untrue, and was based not on the evidence but on the prosecutor's personal opinion. The court reasoned that the remark was therefore improper, and next considered whether the remark had the effect of denying Cheska a fair trial. Because Burns was the government's key witness against Cheska, and because his credibility was at issue, the court was concerned about unfair prejudice to Cheska that could result from an improper bolstering of Burns' credibility. The court found that its corrective instruction was inadequate to remedy the effect of the remark on the jury, especially in light of the fact that the evidence of Cheska's guilt was "far from overwhelming." Therefore, the court "reluctantly" ordered a new trial. The government appeals from that ruling.

## II.

The district court has great discretion in deciding whether to grant a new trial based on prosecutorial misconduct.

*United States v. Henry,* 2 F.3d 792, 794 (7th Cir.1993). This is because the trial court judge is in the best position to determine the seriousness of any incidents that occurred during the trial. *Id.* We have outlined a methodology for the district court to use in making this determination. *See Henry,* 2 F.3d at 794; *United States v. Butler,* 71 F.3d 243, 254 (7th Cir.1995). First, the court should consider whether the remark was improper. If not, the inquiry is over, and there is no reason to grant a new trial. If so, the court should evaluate the remark in light of the entire trial to determine whether it deprived the defendant of an fair trial. *Butler,* 71 F.3d at 254. In assessing the effect of the remark on the fairness of the trial, the court should consider:

> 1) the nature and seriousness of the prosecutorial misconduct; 2) whether the prosecutor's statements were invited by conduct of defense counsel; 3) whether the trial court instructions to the jury were adequate; 4) whether the defense was able to counter the improper arguments through rebuttal; and 5) the weight of the evidence against the defendant.

*Butler,* 71 F.3d at 254. The district court engaged in this analysis and concluded that, on balance, a new trial should be granted.

■ The government claims the remark was not improper in the first instance because it was based on a reasonable inference from the evidence. In the alternative, the government contends that even if the remark was technically improper, 1) the effect of the remark on the jury's assessment of Burns' credibility was slight; 2) the bolstering of Burns' credibility was a legitimate use of the remark; 3) Burns' testimony was not necessary for the conviction; 4) the curative instruction was adequate; and 5) the weight of other evidence against Cheska was substantial. In sum, the government disputes the district court's exercise of discretion in finding that Cheska's trial was rendered fundamentally unfair by the prosecutor's remark. We are not here, of course, to reweigh the considerations of the district court, or to decide if we would have come out the other way. When reviewing the district court's ruling for abuse of discretion, we reverse only if we have a "strong conviction of error." *United States v. McClinton,* 135 F.3d 1178, 1186 (7th Cir. 1998), *cert. denied,* 524 U.S. 921, 118 S.Ct. 2308, 141 L.Ed.2d 167 (1998); *Ladien v. Astrachan,* 128 F.3d 1051, 1056 (7th Cir. 1997) (we are obligated to affirm a decision under the abuse of discretion standard unless no reasonable person could concur with the trial court's assessment under the circumstances). With that standard in mind, we review the government's arguments.

### A.

■ We first consider whether the remark was improper. The district court found that the statement that "Tommy Burns has convicted 23 other people" was not based on a reasonable inference from the evidence and was instead the product of the prosecutor's personal opinion. The district court also noted that, earlier in the trial, it had declined to allow the government to bolster Burns' credibility with the evidence of the results of other criminal cases in which Burns had provided information. The court ruled that the unfair prejudice of this evidence outweighed its probative value, and the court believed that the prosecutor's remark in closing arguments was an attempt to circumvent this ruling. The government disavows any improper motive in making the remark, and explains that the prosecutor was merely trying to demonstrate to the jury that Lisa Kinney had no motive to lie to protect Burns at the time of Cheska's trial.

The government concedes that the remark was literally untrue because Burns could not personally convict anyone, that task being exclusively the province of a jury or a court. The government contends that because no juror would have interpreted the remark literally, the fact that it was literally untrue could not have ren-

dered it improper. Urging us to find that the statement is supported by the record, the government directs us to the following evidence admitted at trial without objection from Cheska: 1) when asked at trial who Jerry Farmer was, Burns replied, "Just one of the 23 people that were convicted in the horse crimes." Burns later testified that he cooperated against Farmer and that Farmer was one of the people convicted in the horse investigation; 2) Burns testified that he admitted to federal authorities that he had killed fifteen horses for owners who were committing insurance fraud; 3) Burns testified that he cooperated with the government extensively, meeting with an FBI agent close to 200 times, telling the government about a number of his friends,and discussing the cases with the government over a number of years; 4) Burns testified that his plea agreement required him to cooperate through the rest of the investigation, that his cooperation extended beyond Cheska's trial, that he had "testified a lot," and had testified before two other judges in earlier trials; 5) Burns testified that as a result of his cooperation, he received a reduced sentence of six months in prison, a sentence he had already served; and 6) Burns testified that when he was sentenced in a related Florida state case, federal authorities told the Florida court of Burns' cooperation in the horse investigation. The government asks us to conclude that from this evidence, it was only a "tiny" inferential step to conclude that Burns was a key figure in the horse investigations and that his cooperation had led to the convictions of 23 people.

Even if we accept the government's explanation of the purpose of the remark, and even though the remark was isolated, delivered in the course of responding to defense attacks on Kinney's credibility and not intentionally improper, we must still consider whether there was an adequate basis in the record to support it. In its order, the district court focused only on Burns' testimony that Farmer was one of 23 people convicted in the horse crimes, and we cannot tell from the record whether the district court considered any of the other evidence that the government now cites in support of the remark. The government concedes that even if the jury assumed the remark meant that Burns was the key player in the convictions of 23 other people, the remark was still an exaggeration. And this is just one possible interpretation of the remark.[1]

Other possible inferences that could be drawn from the evidence the government cites are 1) that there had been 23 convictions; 2) that Burns' contribution was decisive in 23 cases, and that but for Burns' cooperation, those individuals would not have been convicted; 3) 23 juries convicted defendants based on Burns' testimony; 4) a jury or juries convicted 23 individuals on the basis of Burns' testimony; 5) Burns' testimony forced pleas in 23 cases; or 6) Burns' credibility was decisively established in 23 other cases. Some of these inferences are factually incorrect; others have some basis in the record. In any case, the remark is vulnerable in three key respects: the number of convictions, the extent of Burns' contribution and the effect of Burns' contribution. Contrary to the dissent's assertion, we conclude not that the remark is improper because the

1. The dissent cites *United States v. Joy*, 192 F.3d 761 (7th Cir.1999) for the proposition that a prosecutor's remark may be found "appropriate" when viewed in context, even though the remark is literally untrue. A careful reading of *Joy* reveals that the court did not find the remark "appropriate." In *Joy*, the prosecutor repeatedly referred to the police as "we" in her closing argument. The defendant argued that this implied the prosecutor was present with the police as events unfolded, and resulted in improper vouching. The court found that the statements were not "innocuous" and admonished prosecutors to be more precise when addressing juries. Rather than finding the statement "appropriate," the court merely upheld the district court's exercise of discretion in refusing to grant a mistrial. The court ultimately held that this was not improper vouching because no reasonable juror would assume that the prosecutor meant she was literally present with the police as her use of the term "we" implied.

jury may have drawn an improper inference. Rather, the remark was improper because it cannot be supported by the record in these three key respects, and these weaknesses are amply demonstrated by the sample inferences we have drawn.

A giant leap, not simply a "tiny step" was required to conclude that Burns was the person largely responsible for the convictions of 23 other defendants. The government conceded at oral argument that if the prosecutor had argued that 23 other juries believed Burns and that this jury should therefore believe him as well, the remark would be much more difficult to defend, yet that is a very likely interpretation the jury could have placed on the remark. The government urges us to find the inference reasonable under *United States v. Waldemer*, 50 F.3d 1379, 1384–85 (7th Cir.1995), *cert. denied*, 515 U.S. 1151, 115 S.Ct. 2598, 132 L.Ed.2d 845 (1995). There we stated that "[w]hether the evidence bears logical and proximate connection to the point the prosecutor wishes to prove are perhaps the most obvious considerations in determining whether the inference is reasonable." *Id.* The prosecutor purported to make the remarks in response to an attack on Kinney's credibility. He was attempting to rehabilitate her after the defense suggested she was lying to assist Burns, who was her boyfriend. With that standard in mind, we examine the prosecutor's statements. The fact that Burns no longer needed Kinney's assistance because he had struck a deal with the government, and had already served his sentence is certainly logically and proximately connected to the goal of rehabilitating Kinney. But the statement that Burns had already convicted 23 other people is completely unrelated to Kinney's credibility. Rather, it addresses Burns' credibility. Our conclusion is bolstered by what the prosecutor said immediately after commenting that Tommy Burns had already convicted 23 other people: "What is *his* motivation at this point?" Tr. at 2401 (emphasis added). The prosecutor had thus shifted to a discussion of Burns' credibility, which was also under attack.

Of course, there was nothing improper about attempting, in general, to rehabilitate Burns in closing arguments, given the defense attacks on his credibility. The question remains whether the government was allowed to use this particular argument in rehabilitating Burns. The district court was distressed because it had specifically disallowed the prosecutor from raising Burns' extensive involvement in other prosecutions, reasoning that the unfair prejudice of this fact outweighed the probative value. The government counters with our ruling in *United States v. Lindemann*, 85 F.3d 1232, 1243 (7th Cir.1996), *cert. denied*, 519 U.S. 966, 117 S.Ct. 392, 136 L.Ed.2d 307 (1996), where we addressed the use of evidence of cooperation in other cases to counter an attack on a witness' credibility. Amazingly, it was Burns' credibility that was at issue in *Lindemann* as well, another case involving the killing of horses for insurance money. In that case, the trial court admitted over objection evidence that Burns had successfully cooperated in other cases. Lindemann challenged that admission as improper bolstering of Burns' credibility, but we affirmed on the grounds that the evidence was relevant to the issue of bias, because Burns' successful cooperation in other cases made less probable the assertion that Burns was lying in this particular case out of self-interest. The district court in *Lindemann* also clearly instructed the jury that they were to use that evidence only in assessing Burns' credibility and not consider it as direct evidence of the defendant's guilt. In other words, the jury was instructed that it could not use evidence of convictions or guilty pleas in other cases as evidence of the defendant's guilt, but could use it only to assess Burns' credibility. We thus upheld the district court's discretionary decision to allow the evidence in light of the court's assessment of the effect of that evidence on the jury in the context of that trial. *Lindemann*, 85 F.3d at 1243–44.

So the government is correct that the district court might not have abused its

discretion had it allowed evidence and argument relating to Burns' successful cooperation. But it does not follow that the court in Cheska's case was obliged to allow this evidence and argument. As we discuss below, the district court was in the best position to weigh the effect of the argument on the jury in light of the totality of the evidence at that point in time. In light of all of the improper inferences the jury could have drawn from the remark, and the size of the leap from the evidence in the record to the prosecutor's remark, we conclude that the district court did not err in finding that the remark was improper in the context of the trial as a whole.

### B.

■ We must next consider whether the district court abused its discretion in finding that the remark deprived Cheska of a fair trial, and that the curative instruction was inadequate to remedy the problem. Here the government argues that the district court erred in applying the five-part test we set out above. Specifically, the government claims that the court grossly overstated the nature and seriousness of the remark, that bolstering Burns' credibility was not unfairly prejudicial, that the court erred in finding that Burns' testimony was crucial for conviction, that the court's curative instruction was adequate, and that the weight of the evidence was substantial. The government conceded that two of the five factors do not militate in favor of reversal. In particular, the remark was not invited by any improper conduct of defense counsel, and because the remark was made in rebuttal, the defense had no opportunity to respond.

■ The vast majority of the government's argument is directed to asking us to reweigh the considerations addressed by the district court. This is not our function when we are reviewing for abuse of discretion, and we decline the government's invitation to be a Monday morning quarterback with the district court's discretionary weighing of the various factors. The district court was in a far better position than we are to understand the impact of these remarks on the jury, in the context of the whole trial. We have only the cold, black and white record before us. The district court was there to see whether the jury bristled or gasped or perhaps sat impassively when the prosecutor made this remark. The district court was able to assess the credibility of the witnesses and the strength of the evidence presented and determine the impact of this comment in context. This sort of situation is precisely why we use the abuse of discretion standard, and we will not reverse unless it is clear from the cold record that no reasonable person could have ruled as the district court did.

■ Addressing the government's assertions, we cannot find that the district court overstated the nature and seriousness of the remark. In the context of the trial, the district court judge believed this remark could seriously prejudice the jury. He issued a curative instruction:

> Members of the jury, you should make your determination based upon the evidence, not upon any argument by counsel. It's your collective recollection of the evidence that you should use in making your determination in the case.

Tr. at 2401–02. On further consideration, he determined this instruction was inadequate. It certainly was not as complete as the instruction given in *Lindemann*, where the court directed the jury that they were to use the evidence of Burns' successful participation in other prosecutions only in assessing Burns' credibility and not consider it as direct evidence of the defendant's guilt in that case. *Lindemann*, 85 F.3d at 1243–44. The dissent correctly points out that we normally presume a jury will follow the court's curative instruction. Here, however, the very judge that issued the instruction believed, in the context of the trial as a whole, that the instruction was inadequate to remedy the harm. Although we might not have ruled the same way, we cannot say that the district court's discretionary decision regarding the effective-

ness of the curative instruction was an abuse of discretion.

Although it is true that bolstering Burns' credibility was not an improper goal of closing arguments, as we discussed above, the issue is whether it was proper to use this particular evidence in asking the jury to draw the conclusion that Burns was not lying. The district court had already ruled that the evidentiary value of Burns' successful participation in other prosecutions was outweighed by the harm of unfair prejudice. The district court likely feared that the jury would be unduly influenced by the fact that twenty-three other juries had already found Burns credible. Thus, although bolstering Burns' credibility was a proper goal, the district court did not abuse its discretion in finding that the government would have to find some other way to accomplish that goal.

That leaves one final argument, whether the court erred in finding that Burns' testimony was crucial for conviction, and whether the weight of the evidence was substantial. The government contends that the jury could have convicted Cheska even if it completely disbelieved Burns. The jury could have convicted Cheska under one of two theories, according to the government. First, they could have convicted Cheska if they found that Cheska and Nuber hired Burns to kill Valentino, and then Cheska lied to the insurer about the cause of Valentino's death. Second, the jury could have convicted Cheska if they found that he submitted false documents and made false and misleading claims to the insurer regarding the true cost and value of Valentino. Burns' credibility was crucial only to the first theory, the government contends, although the government concedes that Burns' credibility was relevant, but not crucial, to the second theory as well. The government urges us to find that the jury could have "plausibly" convicted Cheska without believing a single word of Burns' testimony. That may well be true, but again, we are reviewing the district court's decision for abuse of discretion, and the district court was in a much better position than we are

to determine the strength of the evidence for the alternate theories, and to predict the effect on the jury of these remarks. Regardless of the government's view of the "ample evidence to convict," the district court believed this was a close case. Indeed, Cheska's co-defendant was acquitted, and so the jury apparently disagreed with the government's "ample evidence" as well, at least as it regarded the evidence against Nuber. We are not left with a "definite and firm conviction" that the district court has erred in making that determination. *McClinton*, 135 F.3d at 1186.

### III.

For all of these reasons, we conclude that the district court did not abuse its discretion in ordering a new trial for Cheska.

AFFIRMED.

BAUER, Circuit Judge, dissenting.

I dissent. I believe that my colleagues have reached a conclusion that runs contrary to firmly-established precedent in this Circuit.

This case is quite simple. A prosecutor uttered a single remark during closing arguments of a two-week-long trial. The defense objected, and Judge Holderman granted a mistrial because of the stray remark. One might wonder what single sentence could so seriously infect a lengthy trial as to render the entire process fundamentally unfair. In this case, the prosecutor said, "Tommy Burns has convicted 23 other people." The remark was intended to rehabilitate Burns' credibility after defense counsel had attacked his truthfulness during closing arguments. According to the district court (and now the majority), this statement so corrupted the entire process that it entitled Cheska to receive a new trial.

To determine whether a defendant is entitled to a new trial because of a prosecutor's remark during closing argument, this court has formulated a two-part test.

The first step requires the court to examine the contested remark in isolation to determine whether the statement is an "improper" remark. *See United States v. Miller*, 199 F.3d 416, 422 (7th Cir.1999); *United States v. McClinton*, 135 F.3d 1178, 1188 (7th Cir.1998); *United States v. Lovelace*, 123 F.3d 650, 655 (7th Cir.1997). If (and only if) we find that the statement was improper, the court then considers the remark in the context of the entire record to evaluate whether it deprived the defendant of a fair trial. *See United States v. Ferguson*, 935 F.2d 1518, 1531 n. 5 (7th Cir.1991).

The district court gave two reasons for declaring the contested statement improper. First, the district judge said the prosecutor's remark was improper because the statement was literally untruthful. That is to say, the trial judge found the remark improper by pointing out that only juries and judges can "convict" criminal defendants and "Tommy Burns having never been a judge or a jury has never convicted anyone." The technical error in the prosecutor's statement clearly did not render the remark improper. No reasonable person could possibly believe that a witness has ever "convicted" a defendant. Rather, read in proper context, the remark was plainly intended to mean that Burns' testimony had played a critical role in securing the convictions of 23 other criminal defendants. Judge Holderman himself recognized the prosecutor's obvious intent when he wrote that the prosecutor probably "intended the remark to be a short-hand or slang way of saying that Tommy Burns's testimony in previous cases brought about the conviction of 23 people." The fact that the statement "Burns has convicted 23 other people" was literally untrue in its strictest sense does not render the comment improper. *See United States v. Joy*, 192 F.3d 761, 769–70 (7th Cir.1999) (finding prosecutor's remark appropriate when viewed in proper context even though it was literally not true).

Judge Holderman also found the statement improper because it was "not supported by the evidence or any fair infer-ence there from and thus can only be considered the personal opinion of the Assistant United States Attorney, which when stated in closing argument was improper and amounted to prosecutorial misconduct." This conclusion seems to me to be erroneous.

This court has repeatedly and consistently adhered to the basic rule allowing the government to comment on the credibility of a witness so long as the remark constitutes a reasonable inference from evidence adduced at trial. *See United States v. Morgan*, 113 F.3d 85, 89 (7th Cir.1997); *United States v. Patterson*, 23 F.3d 1239, 1250 (7th Cir.1994); *United States v. Goodapple*, 958 F.2d 1402, 1409 (7th Cir.1992); *United States v. Spivey*, 859 F.2d 461, 466 (7th Cir.1988). In this case, the evidence supporting the prosecutor's remark could not be more clear. The jury heard Burns identify Jerry Farmer as "[j]ust one of the 23 people that were convicted in the horse crimes." The jury also learned that Burns had helped convict Farmer by cooperating with the government and testifying against Farmer. The jury was told that Burns had cooperated extensively with prosecutors, had met with the FBI 200 times, and discussed numerous horse killing cases with the government. Burns admitted to personally killing 15 horses to defraud insurance companies. Finally, the jury also knew that Burns' agreement with the government extended far beyond Cheska's case, that Burns had "testified a lot," and that Burns had testified in other trials. Confronted with this information, it is reasonable to infer that Burns was a pivotal part of an expansive investigation that helped the government catch "the 23 people that were convicted in the horse crimes."

Rather than recognize that the jury heard evidence which supported the inference that Burns played an important part in helping convict 23 defendants, the majority discusses various inferences that the jury could have drawn from the evidence. Because the jury could have drawn several other inferences, the majority concludes

that the prosecutor's remark was not reasonably based in the evidence. I simply cannot agree that this conclusion is reasonable.

Simply put, the number of inferences that could be drawn from evidence is completely irrelevant to whether one specific inference is reasonable. In other words, just because a jury can draw more than one inference from a set of facts does not, as the majority wrongly concludes, automatically render any of them unreasonable. Rather, an inference is reasonable if that conclusion bears a logical connection to the evidence upon which it is based. Here there was ample evidence to conclude that Burns' assistance to the government was of paramount importance to obtaining 23 other convictions. Because the prosecutor's remark was reasonably based on evidence that the jury heard, it was completely appropriate.

Normally when assessing whether a prosecutor's remark deprived a defendant of a fair trial, we look to five factors: (1) the nature and seriousness of the prosecutorial misconduct; (2) whether the prosecutor's statement was invited by the conduct of defense counsel; (3) whether the trial court's instructions to the jury were adequate; (4) whether the defense was able to counter the improper arguments through rebuttal; and (5) the weight of the evidence against the defendant. *United States v. Butler*, 71 F.3d 243, 254. This analysis "includes an assessment of 'whether and to what extent the improper remark was provoked by the defense counsel's argument—the so-called 'invited response' doctrine.' " *United States v. DePriest*, 6 F.3d 1201, 1210 (7th Cir.1993) (quoting *United States v. Swiatek*, 819 F.2d 721, 730 (7th Cir.1987)).

Applying these factors, and bearing in mind the invited response doctrine, it becomes apparent that Cheska received a fair trial. First, the prosecutor's conduct was completely appropriate; the isolated remark was reasonably based in evidence that the jury heard. Assuming *arguendo* that the statement was improper, it was an isolated remark during a lengthy trial intended to rehabilitate Burns' credibility—a purpose that the majority concedes was appropriate. Since the remark was appropriate because of defense counsel's attack on Burns' credibility, the second factor and the invited response doctrine both favor finding that Cheska received a fair trial. Third, after defendants objected to the statement, the trial court immediately gave a curative instruction by telling the jury to make its "determination based on the evidence, not upon any argument by any counsel" and then later told the jury that it should reach its verdict using only the evidence in the case. The district court's instructions cured any possible prejudice from the stray comment. *See United States v. Kelly*, 991 F.2d 1308, 1314 (7th Cir.1993) (we presume that curative instructions are taken seriously). Although defendants did not have an opportunity to counter the argument because it was made during the prosecutor's rebuttal, they certainly took advantage of their opportunity to denigrate Burns' credibility. Finally, the weight of the evidence against Cheska was considerable. As the government explained in its brief, there was ample evidence to convict Cheska in this case even if the jury did not believe one word of Burns' testimony.

Viewing this trial and the evidence presented as a whole, two things are quite obvious: (1) the prosecutor's closing remark was appropriate because it was reasonably based on evidence that the jury heard; and (2) Cheska was not deprived of a fair trial by the prosecutor's single comment. Because these two conclusions are abundantly clear from a proper application of the law to the facts of this case, the district court abused its discretion when it granted Cheska's motion for a mistrial. I would reverse the district court's order granting Cheska a mistrial and remand the case with instructions to reinstate the jury's verdict.

RICHARDSON ELECTRONICS,
LTD., et al., Petitioners,

v.

PANACHE BROADCASTING OF
PENNSYLVANIA, INC.,
Defendant–Appellee.

Nos. 99–8043, 99–8044.

United States Court of Appeals,
Seventh Circuit.

Submitted Nov. 24, 1999

Decided Jan. 31, 2000

Richard J. Rappaport (submitted), Ross & Hardies, Chicago, IL, for petitioner Richardson Electronics.

Jeffery S. Facter (submitted), Shearman & Sterling, San Francisco, CA, for petitioner Varian Associates.

Marvin A. Miller (submitted) and Patrick E. Cafferty, Miller, Faucher, Cafferty & Wexler, Chicago, IL, for Respondent.

Before POSNER, Chief Judge, and MANION and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

We have before us a request for permission to file an interlocutory appeal under 28 U.S.C. § 1292(b). The request requires us to consider the relation between that section and Rule 23(f) of the Federal Rules of Civil Procedure, which permits interlocutory appeals from orders granting or denying class certification. *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832 (7th Cir.1999). Rule 23(f) be-

came effective on December 1, 1998, long after this suit was filed but before the order sought to be appealed was issued. Generally a new procedural rule applies to the uncompleted portions of suits pending when the rule became effective, and we have no reason to depart from the general principle in regard to Rule 23(f).

The plaintiffs—radio stations and other users of electron power tubes (EPTs)—brought this class action suit in 1990 against manufacturers of the product, alleging that the defendants were fixing prices and otherwise violating the federal antitrust laws to the harm of the plaintiffs, who seek damages. On May 13, over the defendants' objections, the district judge certified a class of EPT purchasers allegedly harmed by the defendants' actions. Two months later the defendants asked the judge to certify his order of certification for immediate appeal under section 1292(b). He granted the motion in October and within the limit of 10 days permitted by the statute the defendants requested our permission to take the appeal.

■ There is no time limit in the statute or in any applicable rules for seeking the district judge's permission to appeal under 1292(b), in contrast to the 10–day limit not here exceeded on seeking our permission if the district judge grants his, concurrent permissions being required. But a district judge should not grant an inexcusably dilatory request, *Weir v. Propst*, 915 F.2d 283, 287 (7th Cir.1990); *Ferraro v. Secretary of HHS*, 780 F.Supp. 978 (E.D.N.Y.1992); cf. *Marisol v. Giuliani*, 104 F.3d 524, 529 (2d Cir.1996), as this appears to be; if he does, we'll refuse our permission to appeal. In any event, no excuse for the defendants' taking two months to appeal has been offered except the patently inadequate one that the case had been "largely dormant" for nine years, requiring the defendants' lawyer to refamiliarize himself with it in the face of a "pre-existing, conflicting commitment to meet a deadline in another case." In these circumstances, the delay alone was sufficient grounds for us to refuse our permission to appeal.

A harder question is whether the appeal satisfies the criteria for a section 1292(b) appeal, which is whether the order sought to be appealed presents a *controlling question of law* as to which there is a *substantial ground for disagreement* and the resolution of which may *materially advance the completion of the litigation*. We shall not have to answer that question, because it merges into the important question presented by the request for our permission to appeal, which is the relation between section 1292(b), which as we said has no fixed deadline for seeking the permission of the district court to take an appeal, and Rule 23(f), which imposes a deadline of 10 days from the date of the order sought to be appealed, a deadline which (if applicable) the defendants exceeded by more than six weeks.

The question in this case that the defendants argue, and the district judge agreed, satisfies the criteria for a section 1292(b) appeal is whether the legal and factual questions common to the certified class of EPT users predominate over the individual questions, so as to justify class treatment under Fed. R. Civ. P. 23(b)(3), given that (according to the defendants) the suit embraces hundreds of different kinds of EPT. This question seems rather too fact-specific to be suitable for a 1292(b) appeal, but the more significant point is that it fits much more neatly into Rule 23(f). The rule itself does not set forth criteria for the exercise of our discretion to entertain appeals from class-certification cases. We endeavored to formulate such criteria in *Blair v. Equifax Check Services, Inc.*, supra, 181 F.3d at 834–35; see also *Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 897 (7th Cir.1999); Committee Note to Fed. R.Civ. P. 23(f). They are whether an immediate appeal is necessary to enable meaningful appellate review of a decision granting or denying class certification or would advance the development of the law governing class actions. The question whether the heterogeneity of the products sold by defendants in a price-fixing suit should block class treatment because the

members of the class buy a different mix of the products is an unresolved question of class-action law and so might justify a Rule 23(f) appeal under *Blair*. Whether it does or not, it seems to us that when a class-certification order is an arguable candidate for a Rule 23(f) appeal, the appellants may not use section 1292(b) to circumvent the 10–day limitation in Rule 23(f).

 We do not cast this conclusion as a rule of statutory interpretation; it is unnecessary, or at least premature, to engage in that or any interpretive exercise in order to solve the problem of circumvention. We need only make clear to bench and bar—and we take this opportunity to do so—that district judges should not, and we shall not, authorize appeal under 28 U.S.C. § 1292(b) when appeal might lie under Rule 23(f). Should a case arise in which a class-certification order is appealable under 1292(b) but not under 23(f), perhaps because it presents an issue that while it satisfies the criteria of the statute does not involve the merits of class certification, the appellant can protect himself by seeking the district judge's permission to take a 1292(b) appeal at the same time that the appellant asks us to entertain his appeal under 23(f).

 We need not, at least at this juncture, consider whether Rule 23(f) may actually supersede section 1292(b) in the area of their overlap. Although judicially promulgated rules are ordinarily trumped by statutes rather than vice versa, section 2072(b) of the Judicial Code makes an exception for the case of procedural and evidentiary rules promulgated by the Supreme Court, a category that of course includes Fed. R. Civ. P. 23(f). We need not decide the extent to which Rule 23(f) curtails the operation of section 1292(b) as a matter of law, however, since as a matter of practice we can avoid conflict between rule and statute in the manner set forth above.

For the reasons explained, we decline to permit the section 1292(b) appeal that the defendants seek to take in this case.

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Everett A. WILLIAMS, Defendant–Appellant.**

**No. 99–1157.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1999.

Decided Jan. 21, 2000.

William T. Grimmer, Kenneth M. Hays (argued), Office of the United States Attorney, South Bend, IN, for Plaintiff–Appellee.

Suzanne Philbrick (argued), Chesterton, IN, for Defendant–Appellant.

Before FLAUM, ROVNER and EVANS, Circuit Judges.

FLAUM, Circuit Judge.

Everett A. Williams appeals the sentence imposed by the district court following his conviction by a jury for possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b). For the reasons stated herein, we affirm.

## I. BACKGROUND

In early 1998, the Metro Special Operations Section ("MSOS") of the South Bend Police Department was conducting a narcotics investigation of Glenn D. Brown, the nephew of the defendant Everett A. Williams. As part of this investigation, an MSOS undercover officer had made several controlled buys of cocaine and cocaine base from Brown.

On March 24, 1998, MSOS undercover officer Wise arranged to purchase several ounces of cocaine and cocaine base from Brown. Brown and Wise agreed to meet at a Lee's Famous Chicken in South Bend to perform the transaction. Undercover officers were conducting surveillance of the area around the time the transaction was to take place. Several of these officers witnessed Brown pass a red Zesta cracker box to the driver of a white car. The car was driven to Lee's Famous Chicken where Williams exited the vehicle carrying a red Zesta cracker box. Williams approached the car where Wise was waiting and handed him the cracker box. Wise gave Williams $4,000 in exchange for the box. MSOS surveillance officers videotaped the exchange. Williams was then arrested, and the cracker box was found to contain four and a half ounces of cocaine base.

Williams was charged with one count of possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b). Williams pled not guilty, claiming that he did not know that the cracker box contained cocaine and that he thought the $4,000 was payment for a car that Brown had sold to the undercover officer. Williams was convicted after a jury trial on August 28, 1998.

The probation office then prepared a Presentence Report ("PSR") to which Williams made several objections. First, Williams challenged the denial of a two-level reduction for acceptance of responsibility under the Sentencing Guidelines ("Guidelines"). He also objected to the denial of downward departures based on his physical condition and the fact that his conviction resulted from a single act of aberrant behavior. On January 5, 1999, the district court held a sentencing hearing at which all of Williams' objections were overruled. At the hearing, Williams also argued for a downward departure under the "safety valve" provision of the guidelines, U.S.S.G. § 5C1.2, but the district court found Williams was not eligible to receive this departure. The district court then sentenced Williams to 63 months in prison, the minimum sentence permitted under the applicable guidelines. Williams now appeals his sentence.

## II. DISCUSSION

Williams challenges four rulings of the district court with respect to his sentence. Williams argues first that the district court erred when it denied him a two-level reduction for acceptance of responsibility; second, that the district court should have granted him a downward departure because of his severe physical disability; third, that the district court erred by not granting a downward departure for aberrant behavior; and fourth, that the district court should have reduced his sentence under the "safety valve" provision of the Guidelines. We consider each of these arguments in turn.

### A. ACCEPTANCE OF RESPONSIBILITY

Williams first argues that the district court erred by denying him a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. The district court's determination that a defendant is not entitled to a sentence reduction for acceptance of responsibility is a factual one that we review for clear error. *United States v. Kamoga*, 177 F.3d 617, 622 (7th Cir.1999). We give great deference to the district court's conclusion in this matter as that court is in a unique position to assess the defendant's motives and genuineness in professing to accept responsibility for his crime. *United States v. Cunningham*, 103 F.3d 596, 598 (7th Cir.1996). "Unlike the district court judge, we do not enjoy a 'front row seat' from which to

assess [the defendant's] statements and demeanor." *Id.* (citations and quotations omitted).

Ordinarily a defendant who chooses to go to trial and force the government to prove his guilt is not eligible to receive a sentence reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1 cmt., n. 2 ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt."). However, the Guidelines contemplate an exception for defendants who proceed to trial solely to challenge issues other than factual guilt. *See id.* For example, a defendant who goes to trial only to challenge the constitutionality of a statute is still eligible to receive the acceptance of responsibility reduction. *See id.*; *United States v. Bonanno*, 146 F.3d 502, 513 (7th Cir.1998). If a defendant challenges factual evidence of guilt as well as legal principles, however, he typically will be ineligible to receive the acceptance of responsibility reduction. *See Bonanno*, 146 F.3d at 513; *United States v. Muhammad*, 120 F.3d 688, 701–02 (7th Cir. 1997).

In this case, the government charged Williams with possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1). This statute provides that "it shall be unlawful for any person knowingly or intentionally (1) to . . . possess with intent to manufacture, distribute, or dispense a controlled substance." Williams contends that the sole issue he wished to contest at trial was that the term "knowingly" implies objective as well as subjective knowledge that he was in possession of a controlled substance. In other words, he argues that under this statute the government had to prove he actually knew that the box he gave to officer Wise contained illegal drugs, not simply that he should have known there were drugs in the box. Williams argues that in order for him to contest this legal issue, he also had to contest the factual issue of his subjective knowledge of the contents of the cracker box. Otherwise, he would be admitting guilt under either legal standard, and there would be no issue upon which to conduct a trial. Therefore, Williams contends that he should not become ineligible to receive the acceptance of responsibility reduction solely because he challenged a factual issue at trial that was a necessary predicate to his legal challenge.

Williams may be correct that had he gone to trial solely to contest the legal definition of the term "knowingly" as used in the statute under which he was charged, he might have been entitled to the acceptance of responsibility reduction even though he challenged a factual issue as well because in that unique situation the legal challenge may be dependent on a concurrent factual challenge. However, that interesting set of facts did not occur in this case, and we do not consider or decide what would have happened had those events come to pass.

The Guidelines' commentary clearly states that when a defendant who has gone to trial seeks a reduction of his sentence for acceptance of responsibility, "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." U.S.S.G. § 3E1.1 cmt., n. 2. In this case, we find no evidence in the record that Williams made any representations to the trial court either before or during trial that he wished to challenge only the legal standard under which he was being prosecuted. A single written objection before trial, and a virtually identical oral objection at trial, made to the government's proposed "ostrich defense" jury instruction[1]

---

1. The text of the "ostrich defense" instruction was as follows:

Since the jury must find that the defendant knowingly committed the charged offense, the defendant may not escape liability by shutting his eyes for fear of what he would learn and plead ignorance. Actual knowledge and deliberate avoidance of knowledge where the defendant cut off his normal curiosity by an effort of will are the same thing. If you find the defendant had a strong suspicion that things were not

---

what they seemed or that the defendant knew or strongly suspected that he was involved in criminal activity but deliberate-

ly avoids learning so, then you may conclude that he acted knowingly.